[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 21, 2003
THOMAS K. KAHN
CLERK

_____

No. 01-15865
_____

D. C. Docket No. 98-08225-CV-FAM


JERRY LEON HALIBURTON,

Petitioner-Appellant,

versus

SECRETARY FOR THE DEPARTMENT
OF CORRECTIONS, James Crosby,
Secretary,

Respondent-Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 21, 2003)


Before TJOFLAT, MARCUS and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Jerry Leon Haliburton was convicted of first degree murder and sentenced to death.[1] After the completion of his direct appeal and state habeas court proceedings, Haliburton filed, pursuant to 28 U.S.C. § 2254, a petition for habeas corpus relief in the district court challenging the first degree murder conviction and death sentence. The district court denied the petition, but granted a certificate of appealability (COA) as to all issues. Haliburton contends that 1) the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); 2) he did not receive a full and fair evidentiary hearing on his *Brady* claim regarding Freddie Haliburton's March 15, 1982 statement; and 3) he received ineffective assistance of counsel at the penalty phase of his trial.[2] For the reasons set forth

---

[1]Haliburton also was convicted of burglary of the victim's residence.

[2]Haliburton also raises other claims in his petition for habeas relief. After thoroughly reviewing his petition and after the benefit of oral argument, however, we find that the following eleven claims are without merit and do not warrant further discussion: 1) he received ineffective assistance of counsel at the guilt phase; 2) he received ineffective assistance of counsel, because trial counsel waived his speedy trial rights; 3) he received ineffective assistance of counsel at the penalty phase, because counsel did not object to the jury instructions; 4) he received ineffective assistance of appellate counsel; 5) the trial court erred by preventing him from presenting evidence of mitigating factors; 6) the trial court erred by refusing to allow defense counsel to comment about an uncalled witness; 7) the trial court erred by failing to declare a mistrial based upon statements about his first trial; 8) the trial court erred in allowing the State to use gory photographs; 9) the trial court erred in refusing to include certain testimony when it reread testimony requested by the jury during its deliberations; 10) the trial court erred in refusing to use a special verdict form; and 11) the cumulative effect of prosecutorial misconduct rendered his trial fundamentally unfair. The following six claims that were raised and rejected in the district court on the merits or as having been procedurally barred have been abandoned on appeal as independent bases for habeas relief: 1) Florida's capital punishment law is unconstitutional; 2) judicial electrocution constitutes cruel and unusual punishment; 3) the burden at the sentencing phase was impermissibly shifted to the defendant; 4) the trial court erred in allowing the jury to

below, we find that Haliburton is not entitled to relief from his conviction or his sentence, and, therefore, we affirm the district court's denial of his petition.

BACKGROUND

In the early morning of August 9, 1981, Donald Bohannon's home was burglarized, and he was attacked with a knife as he slept. "Bohannon died as a result of thirty-one stab wounds over his neck, chest, arms, and scrotum." *Haliburton v. State*, 561 So. 2d 248, 249 (Fla. 1990) (per curiam). His body was found in his bed later that afternoon by his estranged girlfriend, Teresa Kast. "The perpetrator had gained entry to [Bohannon's] apartment by removing glass panes from a jalousie door. Fingerprint evidence led the police to" Haliburton. *Haliburton v. State*, 476 So. 2d 192, 193 (Fla. 1985), *vacated*, 475 U.S. 1078 (1986).

On August 13, 1981, the police took Haliburton to the station house, advised him of his rights, and questioned him for several hours. During the interrogation, Haliburton gave a recorded statement wherein he "admit[ted]

___

consider whether the homicide was especially heinous, atrocious, or cruel; 5) the death sentence was unconstitutional, because the jury heard improper aggravating factors; and 6) the jury instructions during the penalty phase of the trial were unconstitutionally vague with respect to the aggravating factors. Although Haliburton no longer raises claims three through six as independent bases for relief, he continues to argue that his counsel's failure to raise them on direct appeal constituted ineffective assistance of appellate counsel. We, however, already rejected that claim.

3

breaking in and seeing the body," but "did not admit to committing the murder."

*Id.* Nevertheless, he was arrested and charged with first degree murder and burglary. The grand jury, however, returned an indictment only for burglary.[3] Thereafter, on December 17, 1981, Haliburton's counsel waived his right to a speedy trial to secure more time to prepare for the burglary trial.

On March 12th or 15th of 1982, Haliburton's brother, Freddie, and Sharon Williams, Freddie's girlfriend, recorded statements at the police station and at the State Attorney's Office[4] indicating that on separate occasions Haliburton admitted to each of them that he committed the murder.[5] Armed with this additional evidence, the state attorney secured a grand jury indictment on the murder charge on March 24, 1982. Subsequently, in September of 1983, Haliburton was convicted of burglary and first degree murder and sentenced to death. Nelson E.

---

[3]In September and November of 1981 the State twice failed to indict Haliburton for Bohannon's murder.

[4]For ease of reference, we will refer to Freddie's statement at the State Attorney's Office as his March 15, 1982 statement. Freddie gave that statement in the presence of Assistant State Attorney Paul O. Moyle, Sergeant David Houser, and a court reporter. The parties, however, have been unable to locate a transcript of the March 15, 1982 statement.

[5]In early March of 1982 Williams filed a charge of sexual battery against Haliburton after he allegedly held a knife to her throat and attempted to rape her. Apparently, after Freddie learned about the charge, he and Williams told police about Haliburton's alleged confessions to each of them. Later that year, Williams dropped the charge against Haliburton.

Bailey represented Haliburton at trial.[6]  On direct appeal, the Florida Supreme

Court reversed his convictions and remanded the case for a new trial, because it

found that Haliburton's statement to the police without his attorney present, but

after his attorney arrived at the police station and requested to see him, should

have been suppressed.[7]

The State sought certiorari review from the United States Supreme Court,

and, on March 24, 1986, the Supreme Court vacated the judgment and remanded

the case to the Florida Supreme Court for reconsideration in light of *Moran v.*

*Burbine*, 475 U.S. 412 (1986).  *See Florida v. Haliburton*, 475 U.S. 1078 (1986)

(per curiam).  In *Moran*, the Supreme Court declined to find a violation of the

United States Constitution where the police failed to inform the defendant that his

attorney was attempting to contact him before he waived his Fifth Amendment

rights.  475 U.S. at 423–24.  The Supreme Court noted in *Moran*, however, that its

decision did not "disable[] the States from adopting different requirements for the

conduct of its employees and officials as a matter of state law."  *Id.* at 428.  Thus,

---

[6]Although the record is unclear as to who represented Haliburton throughout the original prosecution, it appears that he originally was represented by Mitchell Beers.  Bailey assumed the role of Haliburton's counsel, however, before the first trial.  Then, Charles Musgrove handled the successful appeal, and Bailey and Musgrove handled the second trial, with Bailey functioning as lead counsel.  Bailey is now a judge on the Fifteenth Judicial Circuit of Florida.

[7]The Florida Supreme Court also rejected Haliburton's claim that his waiver of a speedy trial applied only to the burglary charge.  *See Haliburton*, 476 So. 2d at 193.

5

on remand, the Florida Supreme Court maintained its position that the failure to suppress Haliburton's statement violated the due process provision of the Florida Constitution, and, once again, reversed Haliburton's convictions and remanded the case for a new trial. *See Haliburton v. State*, 514 So. 2d 1088, 1090 (Fla. 1987) (per curiam).

Haliburton's second trial began on January 25, 1988, and Bailey was appointed as defense counsel again. The jury convicted Haliburton of burglary and first degree murder and voted nine to three in favor of the death penalty. *See Haliburton*, 561 So. 2d at 249. After considering the evidence, the trial judge found four aggravating factors,[8] no statutory mitigating factors, and insufficient nonstatutory mitigating circumstances to outweigh the aggravating factors. Therefore, the court imposed the death sentence.

The Florida Supreme Court affirmed the conviction and sentence on direct appeal. *Id.* at 252. Thereafter, Haliburton's execution was scheduled for March of

---

[8]The aggravating factors were as follows:

[t]he capital felony was committed by a person under sentence of imprisonment; the defendant was twice previously convicted of violent felonies; the capital felony was committed while engaged in a burglary; and the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification.

*Haliburton*, 561 So. 2d at 249 n.1.

1992, but in February of 1992 he filed a motion to vacate his conviction and sentence pursuant to Florida Rule of Criminal Procedure 3.850 and a motion for a stay of execution. *See Haliburton v. Singletary*, 691 So. 2d 466, 468 (Fla. 1997) (per curiam). A stay was granted on March 12, 1992 to allow the trial court to consider his postconviction motion to vacate. Subsequently, the trial court denied some of the claims in his Rule 3.850 motion and scheduled an evidentiary hearing for the others. After conducting the hearing, the trial court denied the remaining claims,[9] and, thereafter, Haliburton appealed the denial of his Rule 3.850 motion[10]

---

[9]The trial court also denied Haliburton's motion for a rehearing.

[10]In the appeal of the denial of his Rule 3.850 motion, Haliburton raised the following nine claims:

> (1) whether the successor judge properly ruled on [his] motion for rehearing; (2) whether the state withheld exculpatory evidence and whether counsel's performance was deficient during the guilt phase; (3) whether counsel's performance was deficient at the penalty phase; (4) whether the jury instructions and aggravating circumstances were unconstitutionally vague and overbroad; (5) whether the state complied with [his] chapter 119 requests; (6) whether counsel was ineffective in advising [him] to waive speedy trial rights on the burglary charge; (7) whether counsel was ineffective regarding prosecutorial misconduct; (8) whether the jury instructions improperly shifted the burden to [him]; and (9) whether [he] was denied due process when the governor signed his death warrant before the two-year time limit for filing a motion for post-conviction relief expired.

*Haliburton*, 691 So. 2d at 468–69. Claims four and eight were procedurally barred, and, as Haliburton's stay was granted in March of 1992, he conceded that claim nine was moot.

7

and filed a petition for state habeas corpus relief.[11]  On January 9, 1997, the

Florida Supreme Court affirmed the trial court's order denying his Rule 3.850

motion and denied his petition for state habeas corpus relief.

Subsequently, Haliburton filed the instant petition for a writ of habeas

corpus in the Southern District of Florida.  In its preliminary order,[12] the district

court denied eighteen of the twenty claims raised in Haliburton's petition and

ordered an evidentiary hearing to decide whether (1) Freddie's March 15, 1982

statement constituted a basis for a *Brady* violation and for a finding that trial

counsel's performance was ineffective at the guilt phase; and (2) trial counsel's

decision not to present a mental health expert as mitigating evidence constituted

---

[11]In his petition for state habeas corpus relief, Haliburton asserted the following five claims:

> (1) whether appellate counsel's ineffectiveness precluded reliable adversarial testing; (2) whether appellate counsel was ineffective for failing to raise a claim that the sentencing court precluded him from presenting mitigating witnesses; (3) whether appellate counsel failed to argue that the evidence was insufficient to prove guilt; (4) whether counsel was ineffective for not raising on appeal the court's refusal to permit counsel to argue that the grand jury would not indict [him] solely on physical evidence; and (5) whether inadequate limiting instructions on aggravating factors violated [his] right to a reliable capital sentence.

*Haliburton*, 691 So. 2d at 472.

[12]The case originally was assigned to Judge Daniel T.K. Hurley, and, thus, he issued the preliminary order on August 27, 1999.  Subsequently, Judge Hurley recused himself, and the case was assigned to Judge Federico A. Moreno.

8

ineffective assistance of counsel at the penalty phase. *Haliburton v. Sec'y for the Dep't of Corr.*, 160 F. Supp. 2d 1382, 1384, 1387, 1390 (S.D. Fla. 2001). On September 10, 2001, after conducting an evidentiary hearing, the district court denied Haliburton's petition for habeas corpus relief in its entirety, *id.* at 1392, and granted a COA as to all issues, *see Haliburton v. Sec'y for the Dep't of Corr.*, S.D. Fla. 2001, __ F. Supp. 2d __ (No. 98-08225-CV-FAM, Oct. 23, 2001).[13] This appeal followed.

## STANDARD OF REVIEW

"When reviewing the district court's denial of a habeas petition, we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error." *Nyland v. Moore*, 216 F.3d 1264, 1266 (11th Cir. 2000) (per curiam). Moreover, as we are reviewing a final state habeas judgment, "our review is greatly circumscribed and is highly deferential to the state courts" pursuant to § 2254 of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2002).[14]

---

[13]Initially, the court granted a COA as to the two issues addressed in the federal evidentiary hearing. Haliburton, however, filed a motion for clarification as to whether the COA addressed the other issues previously decided by Judge Hurley. The court granted the motion and issued a COA "on all issues including those previously decided by Judge Hurley." *Haliburton*, __ F. Supp. 2d at __.

[14]Haliburton filed his petition for habeas corpus relief on April 10, 1998, well after the enactment of the AEDPA. Thus, our review is governed by the AEDPA. *See Lindh v. Murphy*,

The standards applicable to our review under the AEDPA are well settled.

> First, § 2254(e)(1) provides for a highly deferential standard of review for factual determinations made by a state court: [A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.
> Second, § 2254(d) allows federal habeas relief for a claim adjudicated on the merits in state court only where that adjudication in state court (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* (alteration in original) (citation omitted) (internal quotation marks omitted).

Furthermore, we previously have stated that

> [a] state court decision is 'contrary to' clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case.

*Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001), *cert. denied*, __ U.S. __, 123 S. Ct. 278 (2002). Additionally, "[a] state court's decision [is] an 'unreasonable application' of federal law if it identifies the correct legal rule from Supreme Court case law, but applies that rule in an unreasonable manner to the

---

521 U.S. 320, 322, 326–27 (1997) (providing that the AEDPA applies to federal habeas petitions filed after April 24, 1996).

10

facts of petitioner's case." *Breedlove v. Moore*, 279 F.3d 952, 961 (11th Cir. 2002), *cert. denied*, __ U.S. __, 123 S. Ct. 1278 (2003). Furthermore, a state court decision that "unreasonably extends, or declines to extend, a governing legal principle (as established by Supreme Court case law) to a new context" also constitutes an unreasonable application of federal law. *Id.*

## DISCUSSION

### I. *Brady* Claims

Haliburton contends that he is entitled to relief from his conviction, because the state withheld exculpatory evidence in violation of *Brady*.

In *Brady*, the Supreme Court placed an affirmative duty on the prosecution to reveal any "evidence [that] is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. This duty covers "[i]mpeachment evidence . . . as well as exculpatory evidence." *United States v. Bagley*, 473 U.S. 667, 676 (1985). *Brady* does not, however, require that the prosecution "deliver [its] entire file to defense counsel, but only [that it] disclose" material evidence. *Id.* at 675 (footnote omitted). Evidence is material under *Brady* "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682.

## A. Fingerprint Test Results

In early March of 1982 Williams filed a charge of sexual battery against Haliburton. She alleged that Haliburton held a knife to her throat and attempted to rape her, but, later that same year, she dropped the charge. At Haliburton's second trial in 1988, however, Williams testified that Haliburton held a knife to her throat during the attack in 1982 and said, "You don't think I'd do nothing to you, huh?" and "I do you just like I did that man, I kill you . . . ." She also testified that during the same conversation, he told her that a "knife was the best thing next to a gun," because it would be difficult to prove that he was responsible if he hurt someone with a knife.[15] As testing at the time of the charge did not reveal Haliburton's fingerprints on the knife allegedly used in the attack, he contends that he could have used the fingerprint test results to impeach Williams's testimony that he held a knife to her throat. He, however, contends he was not able to do so, because the State withheld the fingerprint test results in violation of *Brady*.

The state court rejected Haliburton's *Brady* claim as to this issue. *Haliburton*, 691 So. 2d at 470. The court found that the fingerprint test results were for a separate charge that was nolle prossed six years before Haliburton's

---

[15]The trial court found that this testimony was relevant to determine whether Haliburton was confessing to the instant murder.

second trial. *Id.* Moreover, the State Attorney's Office where the charge was filed had an open files policy. *Id.* Thus, the state court concluded that Haliburton could have requested the file on the attack under that policy and presumably discovered the fingerprint test results. *Id.* As the state court's reasonable determination of the facts, *see* 28 U.S.C. § 2254(d)(2), leads us to the conclusion that Haliburton could have discovered the fingerprint test results with due diligence, the state court's determination that the State did not violate *Brady* was an objectively reasonable adjudication of federal law, s*ee id.* § 2254(d)(1). Accordingly, Haliburton is not entitled to relief based upon this claim.

## B. Freddie Haliburton's Gain Time

In June of 1982 Freddie was convicted of burglary and sentenced to twelve years in state prison. During his sentence, he was transferred to the Palm Beach County Jail to testify in both of Haliburton's trials and to be deposed regarding Haliburton's case. While Freddie was in the county jail, however, he could not accrue gain time for his burglary conviction.[16] Thus, Virginia Gay Broome,[17] who was the prosecutor at the time, agreed to write a letter to the Department of

---

[16]"Under Florida law, a prisoner who behaves well and diligently performs assigned work can reduce his term of incarceration by earning gain time." *Raske v. Martinez*, 876 F.2d 1496, 1496 (11th Cir. 1989) (internal quotation marks omitted).

[17]Broome is now a judge on the Fifteenth Judicial Circuit of Florida.

Corrections (DOC) requesting that Freddie not be penalized by losing his gain time while he was in the county jail. *Haliburton*, 691 So. 2d at 470. Haliburton, however, characterizes Broome's letter to the DOC as a deal to induce Freddie's testimony and thus contends that the State failed to disclose the deal fully in violation of *Brady*.

Both Freddie and Broome denied that there was a deal to induce Freddie's testimony, but they both acknowledged that Broome wrote to the DOC about Freddie's lost gain time. *Id.* For example, at Freddie's deposition on January 15, 1988, Broome stated in the presence of Bailey that she told Freddie she "would write and try to keep [him] from losing gain time while" he was in the county jail. Thus, Bailey knew that Broome wrote the letter to the DOC before Haliburton's second trial began. *See United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989) (per curiam) (declining to find a *Brady* violation where defense counsel knew that a witness might have been involved in plea negotiations before the witness took the stand). Furthermore, on cross-examination at the second trial, Freddie testified that the prosecutor agreed to contact the DOC on his behalf, but not in exchange for his testimony.[18]

---

[18]On cross-examination of Freddie, Bailey inquired about the prosecution contacting the DOC on Freddie's behalf as follows:

As the State notified the defense about the letter to the DOC and Freddie testified about the letter at trial, the state court found "no failure on the state's part to disclose relevant evidence." *Haliburton*, 691 So. 2d at 470. We conclude that the Florida Supreme Court's decision that the State disclosed all relevant evidence concerning the deal involving Freddie's gain time was a reasonable application of clearly established federal law, *see* 28 U.S.C. § 2254(d)(1), and was based upon a reasonable determination of the facts, *see id.* § 2254(d)(2).

## II. Federal Evidentiary Hearing

Haliburton contends that although he received an evidentiary hearing on his *Brady* claim regarding Freddie's March 15, 1982 statement, it was not a full and fair hearing because he was not permitted to call Bailey, his trial counsel, to testify.[19] Thus, he contends that he is entitled to a remand for further evidentiary proceedings on this issue. Despite Haliburton's efforts to frame our review in

---

| [Bailey:] | Has anybody in the Prosecutor's Office while you've been here to testify at this trial – answer this question yes or no – has anybody agreed to make any kind of request, recommendation, anything else to the Department of Corrections where you're being held in custody? |
|---|---|
| [Freddie:] | Yes. |
| [Bailey:] | As a result of you being here testifying today; yes or no? |
| [Freddie:] | No. |
| [Bailey:] | Okay. |

[19]To the extent that Haliburton challenges the merits of the *Brady* claim regarding Freddie's March 15, 1982 statement in addition to the procedural aspects of the evidentiary hearing, we affirm the district court's denial of the *Brady* claim.

terms of whether the federal evidentiary hearing was full and fair, there is no such recognized claim for relief, and we instead are treating his claim as one that the district court abused its discretion by conducting the hearing in the way that it did.

The district court ordered an evidentiary hearing to determine whether a transcript of Freddie's March 15, 1982 statement existed, and, if so, whether the State committed a *Brady* violation by failing to disclose the transcript. Contrary to the State's position before the state courts, however, it conceded at the federal hearing that Freddie made a statement at the State Attorney's Office in the presence of Sergeant David Houser, Assistant State Attorney Paul O. Moyle,[20] and a court reporter. The State also conceded that there was a transcript of the statement, which it turned over to the defense, that could not be located at present.

As a result, the court received testimony at the hearing from Houser, Moyle, Richard Barkin, and Freddie to determine the content of the statement. Houser and Moyle, who were both present for Freddie's March 15, 1982 statement, testified that they recalled Freddie giving a formal statement that was transcribed and that the statement identified Haliburton as Bohannon's murderer.[21] Moyle

---

[20]Moyle was the chief homicide prosecutor in Palm Beach County at that time. Moyle is now a judge on the Fifteenth Judicial Circuit of Florida.

[21]Sergeant Houser testified that Freddie's March 15, 1982 statement indicated that Haliburton confessed "that he had gone into the Bohanan [sic] apartment and stabbed Donald Bohanan [sic]." Similarly, Moyle testified that Freddie's March 15, 1982 statement "indicat[ed]

16

also testified that after the grand jury returned an indictment, he turned the file over to Barkin, the prosecutor. Barkin testified that he generally recalled that Freddie's March 15, 1982 statement indicated that Haliburton confessed that he committed the murder. Additionally, although Freddie testified that he made the statement, he invoked his Fifth Amendment right against self-incrimination when asked about the contents of his statement.

When Haliburton rested his case, he reserved the right to call Bailey to testify as to the contents of Freddie's March 15, 1982 statement[22] even though both parties agreed that he would not be able to recall the specifics of the statement. As Bailey could not recall the specifics of the statement, the court was uncertain as to what his testimony would add to the disposition of the *Brady* claim. Therefore, pursuant to 28 U.S.C. § 2246,[23] the court ordered Bailey to testify through interrogatories and affidavits. Specifically, the court allowed each party to submit fifteen interrogatories to Bailey regarding his knowledge of Freddie's

_____

that [Haliburton], his brother, had confessed to this murder."

[22]Haliburton wanted to present Bailey's testimony as to the *Brady* claim and the ineffective assistance of counsel claim. As Bailey testified at the state evidentiary hearing on the ineffective assistance of counsel claim and no new information was presented in the federal evidentiary hearing, the court declined to hear his testimony on that issue again.

[23]Section 2246 provides that in habeas corpus actions, "evidence may be taken orally or by deposition, or, in the discretion of the judge, by affidavit." 28 U.S.C. § 2246.

March 15, 1982 statement and ordered that Bailey answer the interrogatories under oath in an affidavit. Thereafter, the court permitted each party to submit five reply interrogatories and scheduled oral argument to determine whether Bailey's live testimony would be needed after reviewing the answers to the interrogatories.

After both parties agreed to the procedure,[24] Haliburton submitted three questions, the State submitted eleven questions, and neither party submitted reply questions. As anticipated, Bailey's answers to the interrogatories indicated that he did not recall the specifics of Freddie's March 15, 1982 statement, but that he was aware of the statement before the first trial and had a general recollection that the contents of the statement were inculpatory, as were all of Freddie's statements in the case.[25]

---

[24]When the court proposed this procedure, defense counsel did not object.

[25]Bailey answered the interrogatories as follows:

Q4. At the time of Jerry Haliburton's first trial were you aware of Freddie's March 12th statement?
A. When you say "March 12th statement" I assume you are referring to the statement given by Freddie Haliburton to Assistant State Attorney Paul Moyle inside the prosecutor's office with a court reporter present. Yes, I was aware of that statement prior to the first trial.
Q5. What was your understanding/knowledge regarding the contents of that statement?
A. My understanding/knowledge of it was that he repeated what he had told the police earlier, concerning his brother Jerry's confession to him. My understanding was that he repeated the same details of when and where the confession occurred and of the contents of the confession. It was my understanding that his statement to Paul Moyle was fully consistent with

18

Nevertheless, Haliburton maintained at oral argument that he needed to present Bailey's live testimony to test the discrepancy in his answers to the interrogatories – that is, the fact that Bailey could not recall the specifics of Freddie's March 15, 1982 statement, but he generally could recall that it was inculpatory. Based upon Bailey's answers, which were provided under oath, and the testimony of the other witnesses, however, the court found a sufficient evidentiary basis to rule upon Haliburton's *Brady* claim without Bailey's live testimony. *Haliburton*, 160 F. Supp. 2d at 1388.

As Bailey did not testify live, Haliburton contends that he did not receive a full and fair evidentiary hearing. The court, however, received Bailey's testimony in the form of interrogatories pursuant to § 2246. Section 2246 provides, "On application for a writ of habeas corpus, evidence may be taken orally or by deposition, or, in the discretion of the judge, by affidavit. If affidavits are admitted any party shall have the right to propound written interrogatories to the affiants, or to file answering affidavits." 28 U.S.C. § 2246. Additionally, Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts

his later testimony to the grand jury. I also understood it was consistent with what he later testified to at both the first and second trials.

Q6. Did you understand the statement to have been either inculpatory or exculpatory of your client Jerry Haliburton?

A. Extremely and emphatically inculpatory.

gives judges the discretion to expand the record to "include, without limitation, . . . answers under oath, if so directed, to written interrogatories propounded by the judge. Affidavits may be submitted and considered as a part of the record."

In light of the fact that Bailey could not recall the specifics of Freddie's March 15, 1982 statement, we find that the district court was well within its discretion in taking his testimony through interrogatories and considering his answers to the interrogatories as a part of the record. *See* 28 U.S.C. § 2246. Furthermore, the court provided Haliburton an ample opportunity to demonstrate why Bailey's live testimony would be needed through reply interrogatories, which Haliburton did not make use of, and oral argument. Therefore, as the court received testimony from the witnesses who had knowledge of Freddie's March 15, 1982 statement, we conclude that the district court did not abuse its discretion by conducting the evidentiary hearing in the way that it did or by relying upon Bailey's interrogatories in lieu of hearing his live testimony. As a result, Haliburton is not entitled to relief on this claim.

### III. Ineffective Assistance of Counsel at the Penalty Phase

Haliburton contends that he is entitled to relief from his sentence, because he received ineffective assistance of counsel at the penalty phase. The Florida Supreme Court, however, rejected that claim. *Haliburton*, 691 So. 2d at 471.

20

Thus, we must determine whether the Florida Supreme Court's legal conclusions were contrary to or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

It was well settled when the Florida Supreme Court adjudicated Haliburton's ineffective assistance of counsel claim that *Strickland v. Washington*, 466 U.S. 668 (1984), is the controlling legal standard for ineffective assistance of counsel claims. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). To prove that counsel rendered ineffective assistance under *Strickland*, a defendant must demonstrate that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686. Thus, *Strickland* established a two-pronged standard to determine whether counsel rendered ineffective assistance.[26] *Id.* at 687.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

---

[26]The *Strickland* analysis is applicable at both the guilt and penalty phases in a capital case. 466 U.S. at 686–87.

*Id.*[27]

When conducting an ineffectiveness review, the court's role "is not to grade counsel's performance." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc).[28] On the contrary, the court's role in this context is to conduct an objective inquiry and determine whether "counsel's performance is reasonable[] under prevailing professional norms." *Id.* (internal quotation marks omitted). Therefore, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 1314 (internal quotation marks omitted). "Courts must indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." *Id.* (alteration in original) (internal quotation marks omitted). This presumption is even stronger when the court is examining the performance of experienced counsel. *Id.* at 1316. To overcome this presumption in favor of competence, the petitioner bears the heavy – but not insurmountable – burden of

---

[27]As the Florida Supreme Court cited and applied *Strickland* and we have not found a Supreme Court case that is based upon facts that are materially indistinguishable from the facts of this case, we conclude that the Florida Supreme Court's decision was not contrary to clearly established federal law. *See Putman*, 268 F.3d at 1242 (concluding that the state habeas court decision was not contrary to clearly established federal law because it cited and applied *Strickland* to an ineffectiveness claim).

[28]*Chandler* summarizes the clearly established federal law governing ineffective assistance of counsel cases at the time of the Florida Supreme Court's decision. 218 F.3d at 1313–19. Therefore, we cite *Chandler* for the principles to be used in ineffective assistance of counsel cases.

persuading the court "that no competent counsel would have taken the action that his counsel did take." *Id.* at 1314–15.

We note, however, that "[n]o absolute rules dictate what is reasonable performance for lawyers," because absolute rules would impede "the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id.* at 1317 (internal quotation marks omitted). For example, "counsel need not always investigate before pursuing or not pursuing a line of defense," because following a particular line of defense "is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." *Id.* at 1318; *see also Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). Additionally, counsel is not "required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy." *Chandler*, 218 F.3d at 1319. Counsel must be permitted to weed out some arguments to stress others and advocate effectively. *Id.*

Haliburton contends that Bailey was ineffective, because he did not begin preparation for the penalty phase until after the guilty verdict, which resulted in his failure to present mitigating evidence about Haliburton's disadvantaged

23

childhood, alcohol and substance abuse, sex abuse, and brain damage. He contends that Bailey should have introduced this mitigating evidence through the testimony of Susan La Fehr Hession, a mental health expert.

We reject Haliburton's assertion that Bailey did not begin preparing for the penalty phase until after the guilty verdict in the second trial. As Bailey represented Haliburton in the first trial, he had most of the background and preparation work for the penalty phase completed before the second trial began. *Haliburton*, 691 So. 2d at 471. Yet, Bailey testified at the state court evidentiary hearing that during the guilt phase of the second trial, he simultaneously conducted additional follow-up preparation for the penalty phase. Indeed, at the second penalty phase, he presented six additional witnesses.[29] Thus, we find that the Florida Supreme Court's conclusion that the record does not support Haliburton's contention that Bailey failed to begin preparation for the penalty phase until after the guilty verdict was returned is not an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).

Furthermore, Bailey was not deficient for declining to present evidence about Haliburton's disadvantaged childhood, alcohol and substance abuse, sex

---

[29]We present this evidence only as support for the fact that Bailey conducted additional preparation for the second penalty phase hearing, not as conclusive proof that his performance was effective.

24

abuse, and brain damage. As Bailey represented Haliburton in the first and second trials, he was aware of Haliburton's abusive background through frequent contact with his family members, including phone calls, visits to the family members' homes, and conferences at Bailey's office. *See Haliburton*, 691 So. 2d at 471. Additionally, Bailey knew that La Fehr Hession would have testified that there was an indication of brain damage. *Id.* Yet, Bailey decided not to present evidence about Haliburton's abusive background and the indication of brain damage, because such evidence can often hurt the defense as much or more than it can help.[30] *See Crawford*, 311 F.3d at 1321 ("[E]vidence of alcohol or drug abuse . . . often has little mitigating value and can do as much or more harm than good in the eyes of the jury."). Instead, Bailey's strategy in the penalty phase was to paint a picture of a man worth saving by emphasizing Haliburton's close family ties and the positive influence he had on members of his family and fellow inmates. *See Haliburton*, 691 So. 2d at 471.

As Bailey thoroughly investigated Haliburton's background and mental health, we conclude that he knew enough to make an informed, strategic decision

---

[30]At the state evidentiary hearing, Bailey testified that he chose not to present evidence about Haliburton's abusive background in part because such evidence "can paint an appealing picture of how your client was abused and all those factors lead up to him doing what [he] did and you may convince the jury of that absolutely; but you may also convince them that, paint a picture of Frankenstein."

not to present such mitigating evidence and that his strategic decision was reasonable. *See Chandler*, 218 F.3d at 1319 (providing that "counsel [is not] required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy"). Thus, we conclude that the Florida Supreme Court's holding that Bailey's performance at the penalty phase was not ineffective is a reasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).[31]

CONCLUSION

For the foregoing reasons, we conclude that Haliburton has not shown that he is entitled to relief from either his conviction or his death sentence. Thus, the district court properly denied his habeas petition.

AFFIRMED.

---

[31]The Florida Supreme Court concluded in the alternative that "[i]n light of the substantial, compelling aggravation found by the trial court, there is no reasonable probability that had the mental health expert testified, the outcome would have been different." *Haliburton*, 691 So. 2d at 471. Thus, even if we were to assume that counsel's performance was deficient, we find that the Florida Supreme Court's alternative conclusion is a reasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).