MARTIN, Circuit Judge,
dissenting:
Warren Hill continues to look for a way to challenge Georgia’s unique rule which puts the burden on a death row inmate to prove his own intellectual disability beyond a reasonable doubt. He now seeks to file a second or successive habeas corpus petition in federal court, arguing that this Georgia standard unconstitutionally denied him “a fair opportunity to show that the Constitution prohibits [his] execution” based on his intellectual disability. Hall v. Florida, 572 U.S. -, -, 134 S.Ct. 1986, 2001, 188 L.Ed.2d 1007 (2014).
As the majority explains, the precedent in the Eleventh Circuit erects formidable barriers to his efforts. I have, in the past, expressed disagreement with some of our precedent which impedes him. See, e.g., In re Henry, 757 F.3d 1151, 1168-69 (11th Cir.2014) (Martin, J., dissenting) (disagreeing with the majority’s conclusion that Hall is not retroactive); Hill v. Humphrey, 662 F.3d 1335, 1381-86 (11th Cir.2011) (en banc) (Martin, J., dissenting) (concluding, among other things, that “Georgia’s requirement that a capital defendant prove his [intellectual disability] beyond a reasonable doubt would seem inevitably to enhance the risk of unwarranted imposition of the death sentence upon those who are [intellectually disabled]” (quotation marks omitted)); id. at 1365-78 (Barkett, J., dissenting, joined by Marcus and Martin, JJ.); id. at 1378-81 (Wilson, J., dissenting, joined by Martin, *1227 J.). I also fully agree with the dissenting opinion written by Judge Barkett when she earlier served as a member of the panel for Mr. Hill’s case. In re Hill, 715 F.3d 284, 302 (11th Cir.2013) (Barkett, J., dissenting) (“When Hill has proffered uncontroverted evidence of his [intellectual disability], I cannot agree that we have no choice but to execute him anyway because his claim does not fit neatly into the narrow procedural confines delimited by AEDPA.” (quotation omitted)). My views are not shared by the majority of judges on this Court, however, and I am bound by this Court’s rulings to the contrary.
I also recognize that the process by which Mr. Hill asks this court to certify a question to the United States Supreme Court is not encouraged by the Supreme Court and is hardly ever used. But because Mr. Hill’s case presents such important questions, and because the answers the Eleventh Circuit has given to these questions are not otherwise subject to review under 28 U.S.C. § 2244, I would certify two questions to the Supreme Court. Specifically, I would certify these questions: (1) whether the miscarriage of justice exception described in Sawyer v. Whitley, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992),[1] survived the enactment of AEDPA and therefore allows Mr. Hill to bring his claim that he is actually innocent of the death penalty in a successive habeas petition; and (2) whether Hall applies retroactively to cases on collateral review. The first section of this opinion explains why certification of these two issues is proper.
In the second section, I address the Supreme Court’s recent decision in Hall and why it represents a paradigm shift that undermines prior state and federal opinions about Mr. Hill’s intellectual-disability claim. I read Hall to support the conclusion that Georgia’s requirement that death-row inmates prove they are intellectually disabled beyond a reasonable doubt is unconstitutional because it “creates an unacceptable risk that persons with intellectual disability will be executed.” Hall, 572 U.S. at-, 134 S.Ct. at 1990.
Under AEDPA, our denial of Mr. Hill’s application to file a second or successive habeas petition cannot be appealed. 28 U.S.C. § 2244(b)(3)(E). That means the only method available to Mr. Hill to seek Supreme Court review of our order denying him relief is by way of certification under 28 U.S.C. § 1254(2). That statute provides:
Cases in the courts of appeals may be reviewed by the Supreme Court by the following methods:
(1) By writ of certiorari granted upon the petition of any party to any civil or criminal case, before or after rendition of judgment or decree;
(2) By certification at any time by a court of appeals of any question of law in any civil or criminal case as to which instructions are desired, and upon such certification the Supreme Court may give binding instructions or require the entire record to be sent *1228 up for decision of the entire matter in controversy.
28 U.S.C. § 1254.
• I am well aware that the Supreme Court has discouraged use of this certification procedure. The Court has instructed us that the certification procedure is proper only in “rare instances.” See Wisniewski v. United States, 353 U.S. 901, 902, 77 S.Ct. 633, 634, 1 L.Ed.2d 658 (1957). Indeed, I am aware of only four cases in which the Supreme Court has accepted certified questions from Courts of Appeals in the last sixty years. See Iran Nat’l Airlines Corp. v. Marschalk Co., 453 U.S. 919, 101 S.Ct. 3154, 69 L.Ed.2d 1002 (1981); Moody v. Albemarle Paper Co., 417 U.S. 622, 94 S.Ct. 2513, 41 L.Ed.2d 358 (1974); United States v. Barnett, 376 U.S. 681, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964); United States v. Rice, 327 U.S. 742, 66 S.Ct. 835, 90 L.Ed. 982 (1946).
However, I believe the two issues I mentioned are of exceptional importance, well beyond mere “internal difficulties” of this Circuit, Wisniewski, 353 U.S. at 902, 77 S.Ct. 633, and we need Supreme Court guidance. First, the Courts of Appeals are now divided on the question of whether SawyePs holding that an inmate can be innocent of the death penalty survived AEDPA’s gatekeeping provisions. Compare In re Hill, 715 F.3d at 301 (holding that post-AEDPA, “there is no Sawyer exception to the bar on second or successive habeas corpus petitions for claims asserting ‘actual innocence of the death penalty’ ”), and Hope v. United States, 108 F.3d 119, 120 (7th Cir.1997) (holding that the Sawyer exception did not survive AEDPA), with Thompson v. Calderon, 151 F.3d 918, 924 & n. 4 (9th Cir.1998) (holding that the Sawyer exception survived AED-PA); see also LaFevers v. Gibson, 238 F.3d 1263, 1267 (10th Cir.2001) (noting “there is a split among the ... circuits that have addressed the question,” but not resolving the “difficult question because even assuming § 2244(b)(2)(B)(ii) does encompass challenges to a death sentence,” the petitioner’s claim would fail). I understand the Supreme Court itself to have indicated, in the context of reviewing an appeals court’s recall of its mandate, that Sawyer’s “miscarriage of justice standard is altogether consistent ... with AEDPA’s central concern that the merits of concluded criminal proceedings not be revisited in the absence of a strong showing of actual innocence.” Calderon v. Thompson, 523 U.S. 538, 558, 118 S.Ct. 1489, 1502, 140 L.Ed.2d 728 (1998).
Certification of this question would give the Supreme Court a way to bring consistency to an area of the law which otherwise evades its review.[2] Indeed, in Felker v. Turpin, 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), Justice Souter, joined by Justices Stevens and Breyer, wrote a concurring opinion observing that although AEDPA precluded certiorari review over a Court of Appeals’ “ ‘gatekeeper’ determination,” the “statute’s text does not necessarily foreclose all of [the Supreme Court’s] appellate jurisdiction” given the statutory authority to certify questions under § 1254(2). Id. at 666-67, 116 S.Ct. at 2341 (Souter, J., concurring). Justice Souter added, “if it should later turn out that statutory avenues other than certiorari for reviewing a gatekeeping determination were closed, the question whether the statute exceeded Congress’s Exceptions Clause power would be open. *1229 The question could arise if the courts of appeals adopted divergent interpretations of the gatekeeper standard.” Id. at 667, 116 S.Ct. at 2342 (footnote omitted). It has now come to pass that the Courts of Appeals have adopted divergent interpretations of the AEDPA’s gatekeeper standard on the question of Sawyer1 s actual innocence of the death penalty exception.
Second, only the Supreme Court can decide the question of whether Hall applies retroactively to cases on collateral review. See Tyler v. Cain, 533 U.S. 656, 662, 121 S.Ct. 2478, 2482, 150 L.Ed.2d 632 (2001) (holding that § 2244(b)(2)(A)’s retroactivity requirement “is satisfied only if [the Supreme Court] has held that the new rule is retroactively applicable to cases on collateral review”). If there had been no other contrary legal developments since we decided In re Henry, I would not think certification of this retroactivity question appropriate. But there has been a significant development that I cannot ignore. In October 2014, the Supreme Court granted a writ of certiorari to a successive capital habeas petitioner, vacated the Florida Supreme Court’s judgment, and remanded for further consideration in light of Hall. See Haliburton v. Florida, — U.S. -, 135 S.Ct. 178, 190 L.Ed.2d 8 (2014). I can think of no reason for the Supreme Court to remand a case like Haliburton, arising as it did in the context of a successive habeas application, unless it intended for Hall to apply retroactively. The Supreme Court does not “create new constitutional rules of criminal procedure unless those rules would be applied retroactively to all defendants on collateral review through one of ... two exceptions.” Teague v. Lane, 489 U.S. 288, 316, 109 S.Ct. 1060, 1078, 103 L.Ed.2d 334 (1989) (plurality opinion). Remanding Haliburton in light of Hall signals that the Supreme Court intended for Hall to apply retroactively to all cases on collateral review.
The Majority emphasizes the extensive process given to Mr. Hill by both federal and state courts over the years. Right they are, but Mr. Hill’s case is not unique in that regard.[3] For example, Mr. Haliburton’s conviction for a murder committed in 1981 became final for the purposes of retroactivity analysis on June 28, 1991, when the United States Supreme Court denied certiorari review from his direct appeal. See Haliburton v. State, 561 So.2d 248, 249 (Fla.1990), cert. denied sub nom., Haliburton v. Florida, 501 U.S. 1259, 111 S.Ct. 2910, 115 L.Ed.2d 1073 (1991). The Florida Supreme Court then affirmed the denial of state postconviction relief in 1997, see Haliburton v. Singletary, 691 So.2d 466 (Fla.1997), and this Court originally affirmed the denial of federal habeas corpus relief in 2003, see Haliburton v. Sec’y for Dep’t of Corr., 342 F.3d 1233 (11th Cir.2003). If the Supreme Court viewed Hall as sufficient to trump the interests in finality that existed in Haliburton — a case that became final long before Mr. Hill’s— surely the Supreme Court’s actions speak volumes about Hall’s retroactivity. The Majority truly has labored for years over Mr. Hill’s case. That is because what matters is not the extent of the process he gets, but rather arriving at the correct answers to the difficult questions he raises.
II.
This Court has held, and the parties do not dispute, that Hall announced a new rule of constitutional law. See In re Henry, 757 F.3d at 1158 (“Hall did indeed announce a new rule of constitutional law.”). It is well settled that “a case an *1230 nounees a new rule of constitutional law when it breaks new ground or imposes a new obligation on the States or the Federal government.” Id. (quoting Teague, 489 U.S. at 301, 109 S.Ct. at 1070). As In re Henry explained: “For the first time in Hall, the Supreme Court imposed a new obligation on the states not dictated by Atkins [v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)] because Hall restricted the states’ previously recognized power to set procedures governing the execution of the intellectually disabled.” 757 F.3d at 1158-59.
I read Hall as a paradigm shift in the basic assumptions about how much discretion states have to define intellectual disability and to craft procedures to enforce the Eighth and Fourteenth Amendments’ prohibition against executing people who are intellectually disabled.[4] In 2002, Atkins left to individual states “the task of developing appropriate ways to enforce the constitutional restriction.” 536 U.S. at 317, 122 S.Ct. at 2250 (quotation omitted). Seven years later, the Supreme Court reaffirmed that Atkins “did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation will be so impaired as to fall within Atkins’ compass.” Bobby v. Bies, 556 U.S. 825, 831, 129 S.Ct. 2145, 2150, 173 L.Ed.2d 1173 (2009) (alteration and quotation marks omitted). Indeed, when rejecting Mr. Hill’s challenge to Georgia’s unique beyond-a-reasonable-doubt standard of proof, both the Georgia Supreme Court and this Court relied on the language from Atkins that gave states discretion to develop “appropriate ways” to protect the constitutional right. See Hill, 662 F.3d at 1347-48 (rejecting Mr. Hill’s argument that Georgia’s beyond-a-reasonable-doubt standard was contrary to Atkins because Atkins “expressly left the procedures” for determining who was intellectually disabled to the states (citing Atkins, 536 U.S. at 317, 122 S.Ct. at 2250)); Head v. Hill, 277 Ga. 255, 587 S.E.2d 613, 620 (2003) (“[I]n Atkins, the Supreme Court of the United States made clear that it was entrusting the states with the power to develop the procedures necessary to enforce the newly recognized federal constitutional ban on the execution of the [intellectually disabled].” (citing Atkins, 536 U.S. at 317, 122 S.Ct. at 2250)). In other words, the assumption that states were free to come up with “appropriate ways” to define intellectual disability was a primary and indispensable part of the state court’s and this Court’s rejection of Mr. Hill’s challenge to Georgia’s beyond-a-reasonable-doubt standard of proof.
The revolutionary thing about Hall is its holding that “Atkins did not give the States unfettered discretion to define the full scope of the constitutional protection [against executing the intellectually disabled].” 572 U.S. at -, 134 S.Ct. at 1998. “If the States were to have complete autonomy to define intellectual disability as they wished, the Court’s decision in Atkins could become a nullity, and the Eighth Amendment’s protection of human dignity would not become a reality.” Id. at -, 134 S.Ct. at 1999. The Court emphasized the significance of its holding in Hall as maintaining “our Nation’s commitment to dignity and its duty to teach human decency as the mark of a civilized world.” Id. at -, 134 S.Ct. at 2001.
*1231 Because Hall repudiated a basic assumption about Atkins that this Court relied on in its earlier rulings in Mr. Hill’s case, I believe the law-of-the-case doctrine does not apply to Mr. Hill’s current application based on two exceptions to the law-of-the-case rule. First, Hall is “controlling authority [that] has since made a contrary decision of law applicable to th[e] issue.” Culpepper v. Irwin Mortg. Corp., 491 F.3d 1260, 1271 (11th Cir.2007). Second, Hall establishes that the approach taken by our en banc Hill opinion was “clearly erroneous,” such that continuing to apply it “would work manifest injustice.” Id. The assumption in Hill, 662 F.3d at 1347, that states have unfettered discretion to enforce the ban against executing the intellectually disabled is a legal error that is beyond debate in light of Hall. The manifest injustice of applying the law-of-the case doctrine to Mr. Hill is obvious. Doing so would sanction the execution of a person who mental health experts unanimously agree is intellectually disabled. See Hall, 572 U.S. at -, 134 S.Ct. at 1992 (“[T]o impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being.”).
And there are other aspects of Hall that demonstrate it worked a paradigm shift as to oux understanding of the states’ role in protecting the intellectually disabled from wrongful execution. Hall acknowledged that “[t]he States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects.” Id. at-, 134 S.Ct. at 2001. In this vein, Hall emphasized that the risk of error in how a state decides whether an inmate is intellectually disabled is critical to the analysis about whether that decision is constitutional. Hall struck down Florida’s definition of intellectual disability, which “require[d] an IQ test score of 70 or less,” because it was a “rigid rule” that “creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional.” Id. at-, 134 S.Ct. at 1990. In doing so, the Supreme Court stressed that one of the reasons for a categorical rule making intellectually disabled offenders ineligible for the death penalty is that such “persons face ‘a special risk of wrongful execution.’ ” Id. at-, 134 S.Ct. at 1993 (quoting Atkins, 536 U.S. at 320-21, 122 S.Ct. at 2252). The clear implication of Hall is that states may not employ intellectual disability definitions or procedures that “create[ ] an unacceptable risk that persons with intellectual disability will be executed.” Id. at -, 134 S.Ct. at 1990.
Notably, Hall’s conclusion that Florida’s rigid rule was unconstitutional was based, in part, on the “views of medical experts.” Id. at-, 134 S.Ct. at 2000. Of course “[t]hese views [did] not dictate the Court’s decision, yet the Court d[id] not disregard these informed assessments.” Id. (citing Kansas v. Crane, 534 U.S. 407, 413, 122 S.Ct. 867, 871, 151 L.Ed.2d 856 (2002) (“[T]he science of psychiatry ... informs but does not control ultimate legal determinations .... ”)). “Courts must recognize, as does the medical community, that the IQ test is imprecise.” Hall, 572 U.S. at -, 134 S.Ct. at 2001. Hall reasoned that “[a] State that ignores the inherent imprecision of these tests risks executing a person who suffers from intellectual disability.” Id. Likewise, Mr. Hill’s case shows how Georgia’s standard also unreasonably discounts medical determinations that are made to the highest degree of medical certainty, yet may not be beyond a reasonable doubt.
The logic and reasoning of Hall lead me to the conclusion that Georgia’s singular beyond-a-reasonable-doubt standard of proof, like Florida’s rigid IQ cut-off score, must not “create[] an unacceptable risk that persons with intellectual disability will be executed” in order to pass constitution *1232 al muster. Id. at-, 134 S.Ct. at 1990. Georgia’s beyond-a-reasonable-doubt standard, like Florida’s IQ cut-off, is properly understood as a substantive aspect of Georgia’s definition of intellectual disability. See Medtronic, Inc. v. Mirowski Family Ventures, LLC, — U.S. -, -, 134 S.Ct. 843, 849, 187 L.Ed.2d 703 (2014) (noting “that the burden of proof is a substantive aspect of a claim” (quotation marks omitted)). That being the case, it “serves to allocate the risk of error between the litigants.” Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 1807, 60 L.Ed.2d 323 (1979). And the problem is that Georgia’s standard “allocates almost the entire risk of error to the offender while leaving virtually none of it with the State.” Hill, 662 F.3d at 1372 (Barkett, J., dissenting). In this way, it creates an unacceptable risk of wrongful execution and denies offenders, like Mr. Hill, a “fair opportunity to show” they are not eligible for the death penalty based on their intellectual disability.
As this discussion reveals, my reading of Hall leads- me to a very different conclusion than that of the Majority about how it impacts Georgia’s adjudication of intellectual disability claims. Georgia’s statutory definition of intellectual disability is almost identical to Florida’s. Georgia’s statute provides: “ ‘Mentally retarded’ means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period.” O.C.G.A. § 17-7-131(a)(3). Florida’s statute provides, in relevant part:
As used in this section, the term “intellectually disabled” or “intellectual disability” means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term “significantly subaverage general intellectual functioning,” for the purpose of this section, means performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the.rules of the Agency for .Persons with Disabilities. The term “adaptive behavior,” for the purpose of this definition, means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.
Fla. Stat. § 921.137. To the extent that the Georgia and Florida statutes require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before the age of eighteen, both are consistent with the “clinical definitions” of intellectual disability referred to by the Supreme Court in Atkins. 536 U.S. at 318, 122 S.Ct. at 2251; see also id. at 309 n. 3, 122 S.Ct. at 2245 n. 3 (citing definitions of intellectual disability from the American Association of Mental Retardation (AAMR), Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992) and the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000)).[5]
There is one important difference between Georgia’s and Florida’s system for *1233 determining who is not eligible for execution based on intellectual disability. Under Florida’s definition of intellectual disability, Mr. Hill would likely have been considered intellectually disabled, even before the Supreme Court decided Hall. Mr. Hill’s state habeas corpus judge found beyond a reasonable doubt that Mr. Hill had qualifying IQ scores showing significantly subaverage general intellectual functioning. Of course that same judge also found that Mr. Hill failed to prove his adaptive skills deficits beyond a reasonable doubt, but he did find Mr. Hill showed adaptive deficits and was intellectually disabled by a preponderance of the evidence. Unlike Georgia, Florida only requires offenders to prove intellectual disability by clear and convincing evidence, not beyond a reasonable doubt. See State v. Herring, 76 So.3d 891, 895 (Fla.2011) (“[A] defendant must prove each of the three elements [of intellectual disability] by clear and convincing evidence.”). But for Georgia’s uniquely high burden for proving intellectual disability, I have no question that Mr. Hill would have been found intellectually disabled in state habeas corpus proceedings and he would not be facing his execution tomorrow. No one disputes that every mental health expert who has ever evaluated Mr. Hill, now including the state’s three experts, has concluded he is intellectually disabled. The fact that there is now unanimity among these experts makes it all the more striking to recall that even before this unanimity existed, the state habeas court made a finding that Mr. Hill had proved, beyond a reasonable doubt, that his IQ showed he had significantly subaverage intellectual functioning. So it was only on this slender aspect of the intellectual disability determination that Mr. Hill failed to meet Georgia’s beyond-a-reasonable-doubt standard.
I respectfully dissent to the denial of the certification of questions.
APPENDIX A
Petitioner Date of Offense Date that Conviction Date that Court of Date that U.S. Became Final [6] Appeals Affirmed Supreme Court Denial of § 2254 Intervened Federal Habeas Petition
Warren Hill Aug. 17,1990 [7] Jan. 10,1994 [8] Nov. 22, 2011[9] N/A
Freddie Hall Feb. 21,1978[10] Jan. 13,1982[11] . Nov. 16,1986[12] May 27, 2014[13]
*1234 Jerry Haliburton Aug. 9,1981[14] Jun. 2131991[15] Aug. 21, 2003[16] Oct. 6, 2014[17]

. In Sawyer, a case decided before AEDPA became law, the Supreme Court considered “the standard for determining whether a petitioner bringing a successive, abusive, or defaulted federal habeas claim has shown he is 'actually innocent’ of the death penalty to which he has been sentenced so that the [federal habeas] court may reach the merits of the claim.” 505 U.S. at 335, 112 S.Ct. at 2517. The Court held "to show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.” Id. at 336, 112 S.Ct. at 2517.

. I recognize that the Supreme Court could have also granted Mr. Hill’s petition for writ of certiorari from the state court's denial of his successive state habeas corpus petition. However, the issue of whether Sawyer’s equitable exception survived AEDPA's gatekeeping provisions cannot travel to the Court by that route. By definition, AEDPA’s restrictions on second and successive habeas corpus applications apply only to federal courts.

. I have attached a chart to the end of my dissent comparing some of the relevant dates between Messrs. Hill, Haliburton, and Hall.

. The Majority disagrees with my reference to Hall as a "paradigm shift” and "revolutionary.” See Majority Op. at 1226. However, it was this Court's decision in In re Henry that recognized Hall was a new rule because it "imposed a new obligation on the states not dictated by Atkins " for the first time. 757 F.3d at 1158. In re Henry further explained: "Justice Kennedy's Hall opinion explained that the basis for its holding stretched beyond Atkins alone: '[T]he precedents of this Court 'give us essential instruction,' ... but the inquiry must go further.' ” 757 F.3d at 1159 (citations omitted and alterations adopted).

. The AAMR is now known as the American Association on Intellectual and Developmental Disabilities (AAIDD). Florida's current definition of intellectual disability tracks very closely the AAIDD’s most recent definition of intellectual disability. Compare Fla. Stat. § 921.137(1), -with AAIDD, Intellectual Disability: Definition, Classification and Systems of Supports 5 (11th ed.2011) (“Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, *1233 social, and practical adaptive skills. This disability originates before age 18.”).

. A case becomes final on direct appeal when the Supreme Court denies a petition for writ of certiorari or, if none is filed, when the time expires to file such a petition. See McCloud v. Hooks, 560 F.3d 1223, 1227 (11th Cir.2009).

. Hill, 587 S.E.2d at 618.

. Hill v. Georgia, 510 U.S. 1066, 114 S.Ct. 745, 126 L.Ed.2d 708 (1994).

. Hill. 662 F.3d at 1335.

. Hall v. State, 403 So.2d 1319, 1320 (Fla.1981).

. On October 15, 1981, the Florida Supreme Court denied Mr. Hall’s petition for rehearing its decision affirming his conviction and death sentence. Hall, 403 So.2d at 1319. Mr. Hall's time for filing a petition for certiorari in the United States Supreme Court expired on January 13, 1982. See U.S. Sup.Ct. R. 13(1).

. Hall v. Wainwright, 805 F.2d 945 (11th Cir.1986).

. Hall, 572 U.S. at -, 134 S.Ct. at 1986.

. Haliburton v. State, 476 So.2d 192, 193 (Fla.1985), cert. granted, judgment vacated sub nom., Florida v. Haliburton, 475 U.S. 1078, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986).

. Haliburton v. Florida, 501 U.S. 1259, 111 S.Ct. 2910, 115 L.Ed.2d 1073 (1991).

. Haliburton v. Sec’y for Dep't of Corr., 342 F.3d at 1233.

. Haliburton, - U.S. at -, 135 S.Ct. at 178 (granting petition, vacating judgment, and remanding in light of Hall).