[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11037

_____

| FILED |
| U.S. COURT OF APPEALS |
| ELEVENTH CIRCUIT |
| APR 5, 2011 |
| JOHN LEY |
| CLERK |

In re: WILLIAM T. TURNER,

Petitioner.

_____

Application for Leave to File a Second or Successive
Habeas Corpus Petition, 28 U.S.C. § 2244(b)

_____

Before CARNES, HULL and MARCUS, Circuit Judges.

BY THE COURT:

Florida death row inmate William T. Turner has applied, pursuant to 28 U.S.C. § 2244(b)(3)(A), for an order authorizing the district court to consider a second or successive petition for a writ of habeas corpus. Specifically, Turner seeks leave to assert in a second federal habeas petition a claim that he is ineligible for the death penalty because he is mentally retarded. After review, we deny Turner's application.

## I. BACKGROUND

In 1985, Turner was convicted of two counts of first-degree murder for stabbing to death his estranged wife Shirley and her friend Joyce Brown. Turner was sentenced to life imprisonment for his wife's murder and sentenced to death for Brown's.

Turner was 39 years old at the time of the murders. Turner had been married to Shirley for more than a decade when he killed her, and they had two children together. Turner was a high school graduate, graduating within the third quartile of his class and competing on the school's football team. Turner attended junior college and later joined the Air Force and served in Vietnam. Turner had a stable job history and required little supervision at work. Turner owned his own home, which he kept up well and repaired himself.

## A.    State Direct Appeal and Collateral Proceedings

On direct appeal, the Florida Supreme Court affirmed Turner's murder convictions and sentences. Turner v. State, 530 So. 2d 45 (Fla. 1987). Turner then filed a motion to vacate his convictions and sentences pursuant to Florida Rule of Criminal Procedure 3.850, which the state trial court denied. Turner appealed to the Florida Supreme Court and filed a state habeas corpus petition. The Florida Supreme Court affirmed the state trial court's denial of Turner's Rule

3.850 motion and denied his state habeas petition. Turner v. Dugger, 614 So. 2d 1075 (Fla. 1992).

**B.    Turner's § 2254 Petition**

On July 19, 1993, Turner filed his original 28 U.S.C. § 2254 federal habeas petition in the district court. Although it raised eleven claims, Turner's petition did not assert that he was mentally retarded and therefore ineligible for the death penalty.[1]

On June 20, 2002, while Turner's § 2254 petition was pending in district court, the Supreme Court issued Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002), concluding that the execution of mentally retarded persons violates the Eighth Amendment. Six days later, on June 26, 2002, the district court denied Turner's § 2254 petition on the merits in a comprehensive 291-page order. The district court's 2002 order acknowledged Atkins and dismissed Turner's § 2254 petition without prejudice to his right to raise an Atkins claim (1) after exhausting such a claim in state courts and (2) if he receives the requisite authorization from this Court to file a successive petition under § 2244(b)(3).[2] The district court thus

---

[1]Turner did claim his trial counsel were ineffective for not adequately investigating and presenting in the penalty phase evidence that Turner suffered from intellectual deficits and learning disabilities.

[2]The district court order stated:
[T]he Court will dismiss this case without prejudice to Petitioner's right to raise an

expressly conditioned its dismissal without prejudice on two things: exhaustion

and compliance with § 2244(b)(3).[3]  Turner then filed a second Rule 3.850 motion

in the state trial court on December 11, 2002, asserting an Atkins claim.

Turner also appealed the denial of his § 2254 petition.  This Court affirmed.

Turner v. Crosby, 339 F.3d 1247 (11th Cir. 2003).  As to mental retardation as a

bar to execution, this Court refused to address any Atkins claim because that claim

was still pending in state court.  Id. at 339 F.3d at 1276 n.21.  In other words, we

refused to address the Atkins claim in federal court because it had not been

properly raised, presented, and decided in a state court proceeding.  As to mental

retardation as a mitigating factor, this Court concluded that Turner failed to show

his trial counsel were ineffective in the penalty phase, pointing out that Turner's

trial counsel did introduce evidence of his 72 IQ score and borderline intelligence:

> Turner . . . identifies his mental retardation as a[n] area in which his
> counsel should have investigated and presented mitigating evidence. To

Atkins claim in a separate petition in this Court, after exhausting such a claim in the
state courts, if he receives the requisite authorization from the Eleventh Circuit Court
of Appeals to file a second or successive petition.  See 28 U.S.C. § 2244(b)(3)(A).
Additionally, the dismissal without prejudice will not excuse Petitioner from the one-
year limitation period for filing a habeas petition in the federal courts.  See 28 U.S.C.
§ 2244(d)(1).

[3]In this regard, we note that the district court ruled correctly because it had no authority to
exempt the Atkins claim from the second or successive petition requirements in § 2244(b).  The
district court simply stated the obvious: the petitioner could file a second or successive petition if
the court of appeals permitted it, a statement that goes no further than the statute itself.

the extent that Turner argues that evidence of mental retardation would preclude his execution under Atkins v. Virginia, we specifically decline to address any Atkins arguments as Turner currently has an Atkins-based Rule 3.850 motion pending in a Florida court. To the extent that Turner argues that mental retardation acts as indicia of a diminished capacity, which supports a finding that the crime was committed under the influence of extreme mental or emotional disturbance, such mitigating evidence already is encompassed in his similar claim based on trial counsel's alleged failure to put forth mitigating evidence regarding severe mental illness at the time of the murders. To the extent that Turner argues that evidence of mental retardation is by itself a mitigating factor, the most important evidence in his Appendix was presented at trial. Specifically, during the penalty phase, trial counsel introduced Turner's school records, including the fact that he has scored 72 on an IQ test, and [psychiatrist] Dr. Miller testified that Turner was of "borderline intelligence." The new evidence in the Appendix is lay testimony, mostly through family members' affidavits, stating, for example, that Turner was "slow to learn," "was not very bright," and "wasn't quite right." Given Dr. Miller's testimony and that trial counsel presented Turner's actual school records, we conclude that trial counsel's performance clearly did not rise to the level of ineffectiveness . . . .

Id. at 1276 n.21 (quotation marks and citations omitted). This 72 IQ score was from an "Otis test" in the Duval County School Board records.

C.     **Turner's Atkins Claim in State Court**

Subsequently, as to Turner's second Rule 3.850 motion, the state trial court denied Turner's Atkins claim and on September 28, 2010, the Florida Supreme Court affirmed. Turner v. State, 46 So. 3d 568 (Fla. 2010) (unpublished). The Florida Supreme Court stated that Turner had not met his burden of showing he

had significantly subaverage intellectual functioning, the first of the three prongs of the mental retardation definition.  Id.  The Florida Supreme Court stressed that one expert determined Turner's IQ was 98 and another expert determined it was 108, both within the average intelligence range:

> To prove mental retardation, a defendant must demonstrate: (1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen. See § 921.137(1), Fla. Stat. (2007). To satisfy the first prong, the defendant must establish that he or she has an IQ of two or more standard deviations below the mean. Cherry v. State, 959 So.2d 702, 713 (Fla.2007). In accordance with Florida Rule of Criminal Procedure 3.203, the trial court appointed two mental health experts to examine Turner. One mental health expert determined that Turner's full-scale IQ was 98, and the other expert determined that Turner's full-scale IQ was 108. Both of these scores fell within the average intelligence range. Because the expert reports conclusively rebutted the first-prong of Turner's Atkins claim, the trial court did not err in summarily denying Turner's claim that he was mentally retarded.

Id.  On February 28, 2011, the Supreme Court denied Turner's certiorari petition as to the Florida Supreme Court's decision.  Turner v. Florida, — S. Ct. —, 79 U.S.L.W. 3403, 79 U.S.L.W. 3490, 79 U.S.L.W. 3492 (U.S. Feb. 28, 2011) (No. 10-847).

On March 9, 2011, Turner filed his application with this Court for permission to file a second federal habeas petition.

## II.  DISCUSSION

6

## A. Successive § 2254 Petitions

A state prisoner who wishes to file a second or successive federal habeas corpus petition must move the court of appeals for an order authorizing the district court to consider such a petition. 28 U.S.C. § 2244(b)(3)(A). We may not issue such an order if the claims sought to be presented in the second or successive petition were raised in a prior petition. Id. § 2244(b)(1). Additionally, to be permitted to pursue a new claim in a second or successive petition, the state prisoner must make a prima facie showing that:

> (A) the . . . claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Id. § 2244(b)(2)(A)–(B). See also id. § 2244(b)(3)(C) ("The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.").

7

Here, Turner's <u>Atkins</u> claim was not raised in a prior federal habeas petition, and satisfies § 2244(b)(2)(A)'s requirement that the claim be based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." In <u>In re Holladay</u>, 331 F.3d 1169 (11th Cir. 2003), this Court stated that "there is no question that the rule recently announced by the Supreme Court in <u>Atkins</u>—that the execution of mentally retarded persons constitutes 'cruel and unusual punishment' in violation of the Eighth Amendment—is a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court that was previously unavailable." <u>Id.</u> at 1172 (citation omitted).[4]

## B.      Reasonable Likelihood of Mental Retardation Requirement

Our inquiry does not end there, however. As we noted in <u>Holladay</u>, a state prisoner seeking leave to file an <u>Atkins</u> claim in a second § 2254 petition must also show "that there is a reasonable likelihood that he is in fact mentally retarded":

> [O]ur finding that the requirements expressly set forth in 28 U.S.C. § 2244(b)(2)(A) are satisfied in this case does not terminate our analysis. Indeed, these requirements merely represent the minimum showing that

---

[4]Because the Supreme Court announced its <u>Atkins</u> decision a mere six days before the district court denied Turner's § 2254 petition, we find, on the facts and circumstances of this case, that the <u>Atkins</u> claim was "previously unavailable" to Turner.

8

Holladay must make if we are to permit him to file a second or successive petition for a writ of habeas corpus. See § 2244(b)(3)(C) ("The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection."). In this case, we find it manifestly obvious that in order to make a prima facie showing that he is entitled to file a second or successive petition based on [the] Supreme Court's decision in Atkins, Holladay also must demonstrate that there is a reasonable likelihood that he is in fact mentally retarded.

Holladay, 331 F.3d at 1173.[5] To determine whether the reasonable-likelihood-of-mental-retardation standard is met, we measure the state prisoner's application and supporting documentation "against the entire record in th[e] case" and ask whether the prisoner has made "a sufficient showing of possible merit to warrant a fuller exploration by the district court." Id. at 1173-74 (quotation marks omitted). Doing so requires us to consider the definition of mental retardation.

In Atkins, the Supreme Court noted that although different states' statutory definitions of mental retardation were not identical, they "generally conform to the [American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA")] clinical definitions." Atkins, 536 U.S. at 317

---

[5]The Holladay Court reasoned, "Were it otherwise, then literally any prisoner under a death sentence could bring an Atkins claim in a second or successive petition regardless of his or her intelligence. No rational argument can possibly be made that this result is appropriate under § 2244(b)." Id. at 1173 n.1.

n.22, 122 S. Ct. at 2250 n.22. The Supreme Court also listed the clinical

definitions of mental retardation formulated by the AAMR and APA:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).
>
> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id., at 42-43.

Id. at 308 n.3, 122 S. Ct. at 2245 n.3. As outlined below, Florida's definition of

mental retardation substantially parallels the clinical definitions discussed by the

Supreme Court in Atkins.

**C.    Florida's Definition of Mental Retardation**

10

In 2001, even before Atkins, the Florida legislature enacted § 921.137, Florida Statutes, which prohibited execution of mentally retarded persons and established a method for determining which capital defendants are mentally retarded. Section 921.137 defines "mentally retarded" as (1) "significantly subaverage general intellectual functioning," (2) "existing concurrently with deficits in adaptive behavior," and (3) "manifested during the period from conception to age 18." Fla. Stat. § 921.137(1). The Florida statute defines "significantly subaverage general intellectual functioning" as "performance that is two or more standard deviations from the mean score on [an authorized] standardized intelligence test." Id. Florida courts have interpreted § 921.137(1)'s definition of "significantly subaverage general intellectual functioning" to mean an IQ score of 70 or below. Phillips v. State, 984 So. 2d 503, 510 (Fla. 2008). Section 921.137, however, applies only to those defendants sentenced to death on or after its effective date of June 12, 2001. Fla. Stat. § 921.137(8). Because Turner was sentenced in 1985, this Florida statute does not apply to Turner.

Nonetheless, after Atkins, the Florida Supreme Court adopted Florida Rule of Criminal Procedure 3.203, establishing the procedure for all capital defendants raising claims of mental retardation as a bar to execution. See Fla. R. Crim. P. 3.203; Amendments to Fla. R. Crim. P. & Fla. R. App. P., 875 So. 2d 563 (Fla.

11

2004). Rule 3.203's definition of mental retardation is substantially identical to that of § 921.137 and the clinical definitions in Atkins. Compare Fla. Stat. § 921.137(1), with Fla. R. Crim. P. 3.203(b); see also Phillips, 984 So. 2d at 509-10.[6] Turner's state postconviction Atkins challenge proceeded under Rule 3.203.

## D. Analysis of Turner's Claims

When we weigh Turner's application and supporting evidence against the entire record in this case, we conclude Turner has not met his burden of showing a reasonable likelihood that he is mentally retarded. First, Turner has not shown a reasonable likelihood that he satisfies the first prong of Florida's mental retardation test, that of significantly subaverage general intellectual functioning. Turner primarily points to penalty-phase testimony from: (1) a school records custodian, who testified Turner earned a score of 72 on an IQ test taken when he was in grade school; and (2) forensic psychiatrist Dr. Ernest Miller, who testified

---

[6]Florida Rule of Criminal Procedure 3.203(b) provides:
Definition of Mental Retardation. As used in this rule, the term "mental retardation" means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning," for the purpose of this rule, means performance that is two or more standard deviations from the mean score on a standardized intelligence test authorized by the Department of Children and Family Services in rule 65G-4.011 of the Florida Administrative Code. The term "adaptive behavior," for the purpose of this rule, means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community.
Fla. R. Crim. P. 3.203(b).

12

he believed Turner was "of borderline intelligence," which meant "a state of being marginal between normal intelligence and . . . [i]ntellectually handicapped or retarded." However, this IQ score is not below the 70-IQ cutoff Florida has established for the intellectual functioning prong of the mental retardation test. See Atkins, 536 U.S. at 317, 122 S. Ct. at 2250 ("[W]e leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." (brackets omitted)).[7] And, Dr. Miller opined not that Turner was mentally retarded, but that he instead fell between normal intelligence and mental retardation.

Moreover, in state postconviction proceedings pursuant to Rule 3.203, Turner was tested and earned IQ scores of 98 and 108, indicating average intelligence.[8] And the fact that Turner graduated from high school in the third quartile of his class and attended junior college also refutes Turner's contention

---

[7]Florida's 70-IQ cutoff is within the IQ range for mental retardation cited by the Supreme Court in Atkins. See Atkins, 536 U.S. at 308 n.3, 122 S. Ct. at 2245 n.3 ("'Mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70."); id. at 309 n.5, 122 S. Ct. at 2245 n.5 ("It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.").

[8]Turner maintains we should ignore these two IQ scores because IQ scores vary over a person's lifetime and the relevant time frame at which Turner's IQ should be considered is at the time of the murders. Even assuming arguendo that both these propositions were true, they would not help Turner meet his burden, as he proffers only an IQ score from Turner's grade-school years, and Turner was 39 years old at the time of the murders.

13

that he suffered from significantly subaverage intellectual functioning.  See In re Hicks, 375 F.3d 1237, 1240-41 (11th Cir. 2004) (concluding there was no reasonable likelihood petitioner Hicks was mentally retarded because he had an IQ score of 94, a psychiatrist testified he had low-average intelligence but was not mentally retarded, and he obtained his GED and earned a year of college credit while incarcerated).

Additionally, Turner has not shown a reasonable likelihood that he satisfies the second prong of the mental retardation test, i.e., deficits in adaptive behavior. Florida defines "adaptive behavior" as "the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community."  Fla. R. Crim. P. 3.203(b).  See also Atkins, 536 U.S. at 308 n.3, 122 S. Ct. at 2245 n.3 (citing clinical mental retardation definitions requiring "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety").

Turner relies on affidavits from friends, family members, and acquaintances that Turner, among other things: (1) "wasn't very smart in class and had a hard time keeping up"; (2) was "slow to learn"; (3) "was always easily led by others";

14

(4) "was a marginal student at best"; (5) was "really the worst student in the family" and "just barely got by" in school; and (6) "had a very difficult time trying to understand even simple things." However, the record also shows that Turner: (1) played high school football and graduated high school; (2) attended junior college; (3) joined the Air Force and served in Vietnam; (4) was "quite skilled" at tailoring work and "had always been a great worker" when he was a child; (5) had a "stable job history" as an adult and required very little supervision at work; (6) helped care for his mentally disabled younger brother; (7) owned his own home, "kept it up very well," and did repair work on the home by himself; (8) was married for more than a decade; and (9) was "a terrific father" to his daughters. In short, Turner's claim of adaptive deficits is belied by the record as a whole.

Accordingly, based on the entire record, Turner has failed to demonstrate that there is a reasonable likelihood that he is in fact mentally retarded. Therefore, he has not satisfied the requirement of § 2244(b)(3)(C) that he make a prima facie showing that he is entitled to file a successive § 2254 petition asserting a claim under Atkins. See Holladay, 331 F.3d at 1173–74.[9]

---

[9]To the extent Turner seeks to raise in a second § 2254 petition a separate claim that the state courts erred in denying him an evidentiary hearing on his Atkins claim, such a claim is not cognizable in a § 2254 petition. See Carroll v. Sec'y, Dep't of Corr., 574 F.3d 1354, 1365 (11th Cir.) ("[I]t is 'beyond debate' that a state court's failure to conduct an evidentiary hearing on a post-conviction motion does not constitute a cognizable claim for habeas relief."), cert. denied, 130 S. Ct. 500 (2009). In any event, Turner has not shown the requirements of § 2244(b)(2)(A)

15

## III. CONCLUSION

Turner has failed to meet the § 2244(b) requirements for filing a second or successive habeas corpus petition.  Therefore, Turner's Application for Permission to File a Successive Habeas Corpus Petition in the District Court for the Middle District of Florida is denied.

**APPLICATION DENIED.**

---

or (B) are met as to such a claim.