MARCUS, Circuit Judge:
Petitioner John Ruthell Henry, a Florida prisoner scheduled to be executed at 6:00 p.m. on June 18, 2014, has just filed with this Court an emergency application *1153 for leave to file a second or successive federal habeas corpus petition based on 28 U.S.C. § 2244(b) and the United States Supreme Court’s recent decision in Hall v. Florida, — U.S. -, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014). He also seeks a stay of execution pursuant to 28 U.S.C. § 2251. Henry alleges that he is intellectually disabled and, therefore, cannot be executed consistent with the command of the Eighth Amendment ban on cruel and unusual punishment.
After thorough review, we deny the application because Henry cannot circumnavigate the stringent requirements for leave to file a second or successive petition found in § 2244(b). His petition fails for two independent reasons: first, the rule enunciated in Hall v. Florida has not been made retroactive by the United States Supreme Court; moreover, even if it had been, he has not shown a reasonable likelihood that he would benefit from the rule in Hall.
The essential facts and relevant procedural history are these. Shortly before Christmas 1985, Petitioner went to Pasco County to speak to his estranged wife Suzanne Henry. Before he arrived, he had smoked crack cocaine. The couple began to argue during his visit, and the dispute ended when Henry killed Suzanne by stabbing her repeatedly in the throat at least thirteen times. The petitioner told investigators that Suzanne initially grabbed the knife to stab him; but he overpowered her, secured the knife, and then killed her. He then took Eugene Christian-Suzanne’s five-year old son from another marriage — to Hillsborough County. Hours later, Henry killed Eugene by repeatedly stabbing him in the throat.[1]
Henry was convicted of the first-degree murder of Suzanne and received a sentence of death. The Florida Supreme Court, however, reversed his conviction and sentence. Henry v. State, 574 So.2d 73 (Fla.1991) (per curiam). Henry was tried and convicted again and sentenced to death, and the Florida Supreme Court affirmed the conviction and sentence on direct appeal. Henry v. State, 649 So.2d 1366 (Fla.1994) (per curiam), cert, denied, 515 U.S. 1148, 115 S.Ct. 2591, 132 L.Ed.2d 839 (1995). He then sought post-conviction relief under Florida Rule of Criminal Procedure 3.850, but the state courts denied his application. Henry v. State, 862 So.2d 679 (Fla.2003) (per curiam). Henry then proceeded to file his first federal petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Middle District of Florida. He argued only that counsel had been ineffective; no claim for mental retardation was made. The district court denied his petition and we affirmed. Henry v. Sec’y, Dep’t of Corr., 490 F.3d 835 (11th Cir.2007) (per curiam).[2]
*1154 Henry is set to be executed for the murder of Suzanne Henry on Wednesday, June 18, 2014, at 6:00 p.m. under a death warrant that Governor Scott signed on May 2, 2014. On May 5, the Florida Supreme Court issued a scheduling order that set a deadline of May 19 by which time all proceedings were to be completed in state circuit court. The next day, May 6, a Florida circuit court in Pasco County issued a scheduling order that directed Henry to file any postconviction motion by Friday, May 9.
Henry’s counsel opted not to file any petition for collateral relief in the state circuit court. Instead, on May 7, Henry’s counsel formally asked the Governor to authorize a determination of Henry’s sanity, and thus his fitness for execution, as provided in § 922.07 of the Florida Statutes.[3] On May 12, Governor Scott granted Henry’s request and appointed a panel of three psychiatrists. The panel of mental health experts submitted - a report to the Governor that concluded “with reasonable medical certainty that (1) Mr. Henry does not suffer from any DSM-5 psychiatric illness or intellectual disability (formerly referred to as mental retardation in DSMIV), and (2) understands the nature and effect of the death penalty and why it is imposed on him.” Thereafter, in Executive Order 14-169, signed on May 20, Governor Scott dissolved the temporary stay of execution, which left the death warrant “in full force and effect.”
On May 27, 2014, the United States Supreme Court decided Hall v. Florida, concluding that a State cannot execute a person whose IQ test score falls within the test’s margin of error unless he has been able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits. 134 S.Ct. at 2001. Under § 921.137 of the Florida Statutes as interpreted by the Florida Supreme Court, a prisoner sentenced to death previously had been required to show an IQ test score of 70 or below before presenting any additional evidence of his intellectual disability.[4] See Hall v. State, 109 So.3d 704, 707 (Fla.2012) (per *1155 curiam); Cherry v. State, 959 So.2d 702, 712-13 (Fla.2007) (per curiam). The strict 70 IQ score cut-off did not take into account the standard error of the test. The Supreme Court in Hall struck down Florida’s cut-off as violating the Eighth Amendment’s prohibition on cruel and unusual punishment because the rule “misuse[d] IQ score on its own terms” in a way that risked the execution of those with intellectual disabilities. 134 S.Ct. at 2001. Because “an IQ test score represents a range rather than a fixed number,” the Court observed that “when a defendant’s IQ test score falls within the test’s acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.” Id. Thus, in Hall, the Supreme Court concluded that because of a +/- 5 standard of error, “an individual with an IQ test score ‘between 70 and 75 or lower’ ... may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.” Hall, 134 S.Ct. at 2000 (quoting Atkins v. Virginia, 536 U.S. 304, 309 n. 5, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). Soon thereafter, based on this new Supreme Court law, on Friday, May 30, Henry’s counsel filed in Florida circuit court a Defense Motion for Determination of Intellectual Disability as a Bar to Execution, pursuant to Florida Rule of Criminal Procedure 3.203(c).[5] Henry claimed that he scored 78 on an IQ test in 1986,[6] but he alleged that evidence showed “significant limitations in his adaptive functioning that reduce his overall functioning to that of á person with an IQ of less than 70.” Henry pointed to his abusive childhood, which caused cognitive deficits; his family history of mental illness; and testimony that, despite his then-chronological age of 35, Henry had a mental/developmental age equivalent to a 13 or 14 year-old due to poor adaptive functioning. Henry asked the state circuit court: to authorize a determination of mental disability by two experts; to hold an eviden-tiary hearing to consider their findings and all other evidence on the issue of intellectual disability; to stay Henry’s execution pending the outcome of the ■ proceedings; and ultimately to find Henry intellectually disabled and ineligible for the death penalty-
The Florida circuit court denied Henry’s motion as being untimely later that day, explaining that it came after the May 19 deadline for trial court filings established by the Florida Supreme Court. Henry appealed to the Florida Supreme Court, arguing that the May 19 deadline applied only to pending motions, not Henry’s new claim based on Hall. Henry asked that the Florida Supreme Court reverse the state circuit court order and remand for a post-Hall determination of whether Henry is intellectually disabled. The Florida Supreme Court denied the appeal on the merits on June 12, concluding that Henry *1156 was not entitled to an evidentiary hearing because he had not demonstrated a facially sufficient claim of intellectual disability. The court found that, beyond the assertion of his 78 IQ test score, Henry had not alleged any deficits in adaptive functioning or onset prior to age 18. Moreover, the Florida Supreme Court observed that throughout the lengthy litigation of this case not a single doctor had ever opined that Henry was mentally retarded or intellectually disabled. And, indeed, the psychiatrists who had recently examined Henry at the Governor’s direction found no intellectual disability: “[h]is clinical presentation during the evaluation was consistent with intellectual functioning at or above what would be predicted based on his prior IQ test result of 78 (7th percentile).” The psychiatrists also noted that Henry “was able to discuss the legal process accurately in reasonable depth” and “correctly serially subtracted seven from 100 on four of five steps (100-93-79-73-56).” The Florida Supreme Court added that the record did not evince a showing that Henry had adaptive functioning deficits: “Henry was able to drive a car, develop personal relationships, participate in financial transactions, discuss adult concepts, and engage in goal-directed behavior.” Indeed, that court remarked that Henry’s pro se pleadings and oral advoea-cy demonstrated his effective oral and written communication skills and his understanding of the law.[7]
 Henry has now moved this Court for leave to file a second or successive petition for a writ of habeas corpus in the United States District Court for the Middle District of Florida pursuant to § 2244 arguing that the Supreme Court’s recent decision in Hall marks a change in the law respecting claims of intellectual disability and compels the conclusion that he should be given leave to further address his intellectual disability. “AEDPA greatly restricts the power of federal courts to award relief to state prisoners who file second or successive habeas corpus applications.” Tyler v. Cain, 533 U.S. 656, 661, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001); see Gilbert v. United States, 640 F.3d 1293, 1311 (11th Cir.2011) (“If second and successive motions are not ‘greatly restricted],’ there will be no end to collateral attacks on convictions and sentences, and there will be no finality of judgment.” (quoting Tyler, 533 U.S. at 661, 121 S.Ct. 2478)). Before an applicant may file a second or successive habeas corpus application under § 2254 in the district court, he must move in the appropriate Circuit Court of Appeals for an order authorizing the district court to consider the applica *1157 tion. 28 U.S.C. § 2244(b)(3)(A).[8] A three judge panel of the Court of Appeals “may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of [§ 2244(b) ].” Id. § 2244(b)(3)(C). An applicant must show either (A) “that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable,” or (B) that “the factual predicate for the claim could not have been discovered previously through the exercise of due diligence,” and that “the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.” Id. § 2244(b)(2). Henry does not argue for relief based on the second prong. And he cannot satisfy the first because his claim is not based on a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court.[9]
*1158 A ease announces a new rule of constitutional law when it breaks new ground or imposes a new obligation on the States or the Federal government. Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 108 L.Ed.2d 334 (1989). Put another way, a case announces a new rule if the result was not dictated by precedent existing when the defendant’s conviction became final. Id. at 301, 109 S.Ct. 1060; see Desist v. United States, 394 U.S. 244, 263, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting) (distinguishing between “whether a particular decision has really announced a ‘new’ rule at all or whether it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior ease law”).
In Hall, the Supreme Court concluded that “when a defendant’s IQ test score falls within the test’s acknowledged and inherent margin of error,” the Constitution’s Cruel and Unusual Punishment Clause requires that “the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.” Hall, 134 S.Ct. at 2001. Hall did indeed announce a new rule of constitutional law.[10] Previously, in Atkins, the Supreme Court prohibited the execution of the intellectually disabled, but “le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.” 536 U.S. at 317, 122 S.Ct. 2242 (second alteration in original) (quoting Ford v. Wainwright, 471 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). For the first time in Hall, the Supreme Court imposed a new obligation on the states not dictated by Atkins because Hall restricted the states’ previously recognized power to set procedures governing the execution of the intellectually *1159 disabled. In addition, Justice Kennedy’s Hall opinion explained that the basis for its holding stretched beyond Atkins alone: “[T]he precedents of this Court ‘give us essential instruction,’ ... but the inquiry must go further.... In this Court’s independent judgment, the Florida statute, as interpreted by its courts, is unconstitutional.” Hall, 134 S.Ct. at 1999-2000 (quoting Roper v. Simmons, 543 U.S. 551, 564, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)). Nothing in Atkins dictated or compelled the Supreme Court in Hall to limit the states’ previously recognized power to set an IQ score of 70 as a hard cutoff. This is plainly a new obligation that was never before imposed on the states, under the clear language of Atkins, and of Hall itself.
But Henry is not entitled to leave to file a second or successive petition because the Supreme Court has not made the new rule announced in Hall retroactive to cases on collateral review. Thus, he simply cannot meet the requirements set by Congress. See 28 U.S.C. § 2244(b)(2)(A). Indeed, the petitioner has made no argument that Hall was made retroactive by the Supreme Court. In Tyler v. Cain, Justice Thomas writing for a plurality of four justices concluded that “[biased on the plain meaning of the text read as a whole, ... ‘made’ means ‘held’ and, thus, the requirement is satisfied only if th[e Supreme] Court has held that the new rule is retroactively applicable to cases on collateral review.” Id. at 662, 121 S.Ct. 2478. Under this interpretation, the petitioner cannot satisfy the requirements embodied in § 2244(b)(2)(A). It is undeniable that the rule pronounced by the Supreme Court in Hall was not made retroactive to cases on collateral review. Hall made no mention of retroactivity. Nor has any subsequent Supreme Court case addressed the issue, much less made Hall retroactive. Unlike this case, Hall did not arise in the context of federal habeas review.[11]
*1160 Also in Tyler v. Cain, Justice O’Connor in a concurring opinion further explained that the Supreme Court could make a new rule retroactive to cases on collateral review “through multiple holdings that logically dictate the retroactivity of the new rule.” 533 U.S. at 668, 121 S.Ct. 2478 (O’Connor, J., concurring); see id. (“[I]f we hold in Case One that a particular type of rule applies retroactively to cases on collateral review and hold in Case Two that a given rule is of that particular type, then it necessarily follows that the given rule applies retroactively to cases on collateral review.”). We look to Justice O’Connor’s concurring opinion as well because when “no single rationale explaining the result enjoys the assent of five Justices, ‘the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.’” Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). Thus, like our sister circuit courts, we have recognized “retroactivity by logical necessity” as an alternative method of satisfying § 2244(b). In re Holladay, 331 F.3d 1169, 1172 (11th Cir.2003); see, e.g., In re Morgan, 713 F.3d 1365, 1368 (11th Cir.2013); In re Moss, 703 F.3d 1301, 1303 (11th Cir.2013); see also, e.g., United States v. Redd, 735 F.3d 88, 91 (2d Cir.2013) (per curiam); In re Zambrano, 433 F.3d 886, 888 (D.C.Cir.2006); Cannon v. Mullin, 297 F.3d 989, 993 n. 3 (10th Cir.2002); In re Turner, 267 F.3d 225, 228 (3d Cir.2001).
In In re Holladay, we applied Justice O’Connor’s analysis to find that the rule pronounced by the Supreme Court in Atkins was made retroactive for purposes of § 2244(b). See In re Holladay, 331 F.3d at 1172. In doing so, we read Atkins alongside the Court’s earlier opinion in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), which stated that a rule prohibiting “the execution of mentally retarded persons ... would be applicable to defendants on collateral review” because “a new rule placing a certain class of individuals beyond the State’s power to punish by death is analogous to a new rule placing certain conduct beyond the State’s power to punish at all.” Id. at 330, 109 S.Ct. 2934. While Penry did not recognize an Eighth Amendment prohibition on the execution of the intellectually disabled, Atkins later did, holding that “the Constitution ‘places a substantive restriction on the State’s power to take the life’ of a mentally retarded offender.” Atkins, 536 U.S. at 321, 122 S.Ct. 2242. Taking the two holdings together, we saw “no question that the new constitutional rule abstractly described in Penry and formally articulated in Atkins is retroactively applicable to cases on collateral review.” In re Holladay, 331 F.3d at 1173; accord In re Turner, 637 F.3d 1200, 1203 (11th Cir. 2011) (opinion by the Court); In re Hill, 437 F.3d 1080, 1082 (11th Cir.2006) (opinion by the panel); see Ochoa v. Sirmons, 485 F.3d 538, 540 n. 2 (10th Cir.2007) (per *1161 curiam); Davis v. Norris, 423 F.3d 868, 879 (8th Cir.2005); In re Morris, 328 F.3d 739, 740 (5th Cir.2003) (per curiam).
Here, however, no combination of Supreme Court holdings compels the conclusion that Hall is retroactive to cases on collateral review. See In re Dean, 375 F.3d 1287, 1290 (11th Cir.2004) (opinion by the panel) (“Multiple cases can, together, make a rule retroactive, but only if the holdings in those cases necessarily dictate retroactivity of the new rule.” (emphasis added)). Atkins had Penny, but there are no Supreme Court cases here that necessarily dictate that the Hall rule is retroactive. The Supreme Court has never held that a rule requiring procedural protections for prisoners with IQ scores within the test’s standard of error would be retroactive. Nor does the Penny principle— that any rule placing a class of individuals beyond the state’s power to execute is retroactive-apply here because Hall merely provides new procedures for ensuring that States do not execute members of an already protected group. Cf. In re Morgan, 713 F.3d at 1368 (concluding that the Supreme Court had not made the rule in Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), retroactive for purposes of § 2244(b) because the rule did not impose a categorical bar to a type of punishment, but instead “changed the procedure by which a sen-tencer may impose a sentence of life without parole on a minor”). The Supreme Court made clear in Hall that the class affected by the new rule — those with an intellectual disability — is identical to the class protected by Atkins. See Hall, 134 S.Ct. at 1990 (“This Court has held that the Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability. Atkins, 536 U.S. at 321, 122 S.Ct. 2242.... [Florida’s] rigid rule, the Court now holds, creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional.”). Hall did not expand this class; instead, the Supreme Court limited the states’ power to define the class because the state definition did not protect the intellectually disabled as understood in Atkins. Hall, 134 S.Ct. at 1986 (looking to Atkins, 536 U.S. at 309 n. 5, 122 S.Ct. 2242, in reaching the “Court’s independent assessment that an individual with an IQ test score ‘between 70 and 75 or lower’ ... may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning”).
Moreover, even if we could say, as the dissent suggests, that Hall expanded the class of individuals described in Atkins, it did not categorically place them beyond the power of the state to execute. Instead, Hall created a procedural requirement that those with IQ test scores within the test’s standard of error would have the opportunity to otherwise show intellectual disability. Hall guaranteed only a chance to present evidence, not ultimate relief. Therefore, Penny in no way dictated that the rule announced in Hall is retroactive to cases on collateral review. The long and the short of it is that the rule announced by the Supreme Court in Hall has not been made retroactive. In the absence of any such ruling from the United States Supreme Court, we are without power to grant leave to file a second or successive petition.
The petitioner’s problem is compounded, however, because even if the Supreme Court had made the rule announced in Hall retroactive to cases on collateral review — and it has not done so — we still could not authorize the filing of a second or successive habeas petition because Henry has not made a “sufficient showing of possible merit to warrant a further exploration by the district court.” In re Holladay, 331 F.3d at 1173 (quoting Bennett v. *1162 United States, 119 F.3d 468, 469 (7th Cir.1997)). An applicant must show a reasonable likelihood that he would benefit from the new rule he seeks to invoke in a second or successive petition. Id.; see In re Turner, 637 F.3d at 1205 (requiring that an applicant show a reasonable likelihood that he is mentally retarded before granting leave to file a second or successive habeas petition based on Atkins); In re Hicks, 375 F.3d 1237, 1240 (11th Cir.2004) (opinion by the Court) (same); see also In re Bowling, 422 F.3d 434, 436 (6th Cir.2005) (requiring sufficient allegations of fact together with some documentation of mental retardation); In re Morris, 328 F.3d 739 (requiring a showing that the “applicant should be categorized as ‘mentally retarded’ ”); cf. In re Vassell, 751 F.3d 267, 270-71, 2014 WL 1779039, at *4 (4th Cir. May 6, 2014) (“[W]hile our primary consideration in reviewing a request for authorization in this kind of case is whether the applicant made the requisite prima facie showing about a new rule of constitutional law, nothing in either § 2255 or § 2244 requires us to ignore other considerations and authorize the filing of a successive § 2255 motion that, for instance, would clearly be time-barred. The statute, we conclude, simply does not require such an exercise in futility.”). Indeed, without this additional requirement, any prisoner could bring a second or successive petition based on a new constitutional rule made retroactive on collateral review by the Supreme Court, even if it had no bearing on his case. See In re Holladay, 331 F.3d at 1173 n. 1.
Henry does not meet this requirement. The only record evidence in this case of Henry’s IQ comes from a 1986 application of the Wechsler Adult Intelligence Scale, which demonstrated he had a 78 IQ. The rule announced in Hall, however, affords Henry no relief in this case. In Hall, as we’ve noted, the Supreme Court concluded that because of a +/- 5 standard of error, “an individual with an IQ test score ‘between 70 and 75 or lower’ ... may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.” Hall, 134 S.Ct. at 2000 (quoting Atkins, 536 U.S. at 309 n. 5, 122 S.Ct. 2242). The dissent elides around this holding in Hall, and suggests that no matter the IQ score — be it 75, 78, or presumably even 88 — a defendant should still be allowed to present evidence about the deficiencies in his adaptive functioning in order to make a claim of intellectual disability. But this is not what Hall says. Hall squarely holds that it is “the Court’s independent assessment that an individual with an IQ test score ‘between 70 and 75 or lower’ may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.” 134 S.Ct. at 2000; see American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-5) 37 (5th ed. 2013) (“Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally + 5 points).... [T]his involves a score of 65-75 (70 ± 5)”). The Supreme Court never said that a petitioner who could only establish an IQ score of, say, 78 would be entitled anyway to make up the difference with other evidence of deficiencies. See 134 S.Ct. at 1996 (“Petitioner does not question the rule in States which use a bright-line cutoff at 75 or greater ... and so they are not included alongside Florida in this analysis.”). The problem petitioner has under Hall is he can point to no IQ test yielding a score of 75 or below. Thus, building in the standard error approach explicated by the Supreme Court in Hall would not entitle Henry to the additional “opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning.” Hall, 134 S.Ct. at *1163 2001. The Supreme Court in Hall did not hold that a petitioner like Henry, who only has IQ test scores above 75 (here an IQ score of 78), must have an additional chance to demonstrate intellectual disability by pointing to deficiencies in adaptive skills. At the end of the day, taking into account the standard error of measurement explicated by Hall does not entitle Henry to the opportunity to present additional evidence of an intellectual disability.
Moreover, the record presented to us is very thin. No mental health expert has squarely opined that the petitioner is intellectually disabled, and indeed, in the most recent examination conducted at the request of the petitioner and at the direction of the Governor, three psychiatrists unanimously concluded that Henry suffered from no intellectual disability as defined in DSM-5. Rather, they opined, he had intellectual functioning at or above the level predicted by his 78 IQ test score.[12]
Having concluded that Henry cannot satisfy the stringent requirements found in § 2244(b) for leave to file a second or successive habeas petition, we also deny his motion for a stay from execution. Title 28 U.S.C. § 2251 supplies four factors we consider: “[W]hether the movant has made a showing of likelihood of success on the merits and of irreparable injury if the stay is not granted, whether the stay would substantially harm other parties, and whether granting the stay would serve the public interest.” In re Hollar day, 331 F.3d at 1176 (quoting Bundy v. Wainwright, 808 F.2d 1410, 1421 (11th Cir.1987)). However, because Henry has not established any likelihood of success on the merits, the motion for a stay must be denied.
APPLICATION FOR LEAVE AND MOTION FOR STAY DENIED.

. Ten years before Petitioner’s 1985 murder of Suzanne and Eugene, Petitioner was convicted of second degree murder for killing his first wife, Patty, also by repeatedly stabbing her in the throat. Henry v. Sec’y, Dep’t of Corr., 490 F.3d 835, 837 n. 2 (11th Cir.2007) (per curiam).

. Henry was also convicted and sentenced to death for the murder of Eugene Christian, and once again, the Florida Supreme Court reversed on direct appeal and remanded for a new trial. Henry v. State, 574 So.2d 66 (Fla. 1991) (per curiam). But just as in this case, Henry was convicted of first degree murder and sentenced to death for Eugene’s murder in a second trial. Both the conviction and the sentence were affirmed. Henry v. State, 649 So.2d 1361 (Fla.1994) (per curiam), cert. denied, 516 U.S. 830, 116 S.Ct. 101, 133 L.Ed.2d 55 (1995). The denial of post-conviction relief was also affirmed. Henry v. State, 948 So.2d 609 (Fla.2006) (per curiam). Henry’s federal petition for a writ of habeas corpus challenging the validity of his conviction for murdering Eugene Christian was denied by the United States District Court in the Middle District of Florida on February 4, 2011. Henry v. McDonough, No. 8:07-cv- *1154 406-T-23TBM, 2011 WL 397939 (M.D.Fla. Feb. 4, 2011). Henry’s current application for leave to file a second or successive habeas petition does not concern his conviction and sentence for the murder of Eugene.

. In relevant part, § 922.07 states:
(1) When the Governor is informed that a person under sentence of death may be insane, the Governor shall stay execution of the sentence and appoint a commission of three psychiatrists to examine the convicted person. The Governor shall notify the psychiatrists in writing that they are to examine the convicted person to determine whether he or she understands the nature and effect of the death penalty and why it is to be imposed upon him or her....
(2) After receiving the report of the commission, if the Governor decides that the convicted person has the mental capacity to understand the nature of the death penalty and the reasons why it was imposed upon him or her, the Governor shall immediately lift the stay and notify the Attorney General of such action....
(3)If the Governor decides that the convicted person does not have the mental capacity to understand the nature of the death penalty and why it was imposed on him or her, the Governor shall have the convicted person committed to a Department of Corrections mental health treatment facility.
Fla. Stat. § 922.07.

. In relevant part, § 921.137 provides:
[T]he term “intellectually disabled” or “intellectual disability” means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18. The term "significantly subaverage general intellectual functioning,” for the purpose of this section, means performance that is two or more standard deviations from the mean score on a standardized intelligence test....
Fla. Stat. § 921.137(1).

. In relevant part, Rule 3.203 states:
(c) Motion for Determination of Intellectual Disability as a Bar to Execution: Contents; Procedures.
(1) A defendant who intends to raise intellectual disability as a bar to execution shall file a written motion to establish intellectual disability as a bar to execution with the court....
(d) Time for filing Motion for Determination of Intellectual Disability as a Bar to Execution. The motion for a determination of intellectual disability as a bar to execution shall be filed not later than 90, days prior to trial, or at such time as is ordered by the court....
(f) Waiver. A claim authorized under this rule is waived if not filed in accord with the time requirements for filing set out in this rule, unless good cause is shown for the failure to comply with the time requirements.
Fla. R.Crim. P. 3.203.

. The Florida Supreme Court states that this test occurred in 1987.

. In the meantime, on June 5, 2014, this Court received a pro se letter from Henry that asked all members of the Court to stay his execution on the ground that he was tried by a jury made up of "a majority of white [rather] than persons of color.” The letter requested that this Court should require that all juries be composed of "6 whites” and "6 personfs] of color,” and asked that we vacate his death sentences. Pursuant to our longstanding rules, "[w]hen a party is represented by counsel, the clerk may not accept filings from the party.” 11th Cir. R. 25-1. Therefore, we did not accept Henry’s letter because he had an attorney who was, and is, actively representing him in attempting to stay and vacate the death sentence. Moreover, had we accepted the letter as a pro se filing, we would have been compelled by 28 U.S.C. § 2244 to deny it as a motion for leave to file a second or successive habeas petition. He did not rely on any new rule of constitutional law, the factual predicate of his claim was not previously undiscoverable, and the facts underlying the claim would not have established by clear and convincing evidence that no reasonable factfinder would have found him guilty of homicide. See 28 U.S.C. § 2244(b)(2). Finally, any ruling that addressed the claims raised in the letter would have limited his ability to now claim Hall v. Florida set out a new rule of constitutional law unavailable at the time of his most recent habeas application.

. In relevant part, § 2244(b) states:
(2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless — ■
(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.
(3)(A) Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.
(B) A motion in the court of appeals for an order authorizing the district court to consider a second or successive application shall be determined by a three judge panel of the court of appeals.
(C) The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.
28 U.S.C. § 2244(b).

. The dissenting opinion suggests that we ought not to address the retroactivity question because we do not need to, the timing is short, and the state has not responded to the application. We disagree. First, we do not see how we can fairly avoid addressing the stringent statutory requirements erected by Congress. After all, the legislature has placed this burden squarely on the petitioner, who has already filed one federal habeas corpus petition. Thus, before deciding whether a petitioner has shown a reasonable likelihood of benefiting from a rule, we are obliged to address the statutory command and decide whether that rule was "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.” 28 U.S.C. § 2244(b)(2)(A). Indeed, we can find no circuit case where an appellate court has avoided addressing in any way the statutoiy retro-activity requirement found in § 2244(b)(2), and instead simply decided the case on whether an applicant put forward "a sufficient showing of possible merit.” In re Holladay, 331 F.3d at 1173 (quoting Bennett, 119 F.3d at 469). The overwhelming majority of circuit cases have only addressed the application of the new rule and retroactivity requirements to the petitioner' pleadings. In some instances, the courts have also looked for possible merit. See, e.g., id. But never, as best we can tell, has a federal court of appeals avoided any mention of the petitioner's statutory obligations.
As the dissenting opinion sees the case, Henry should be entitled to file a second or successive petition under § 2244(b)(2) be *1158 cause he's made a sufficient merits showing. However, even if we were to agree with that result, we would still be required to answer the statutory requirements of § 2244(b)(2), since Congress has made clear that a petitioner is not entitled to file any second or successive petition without meeting those statutory obligations.
As for timing, we are required to address the questions raised in this case promptly because Henry’s execution has been set for Wednesday, June 18, 2014, at 6:00 p.m., and because he just filed his application for leave to file a second or successive petition on Saturday, June 14, even though the execution is taking place nearly 29 years after the murder. What's more, this Court necessarily must apply § 2244(b)(2) under a tight time limit in all cases, since the statute expressly requires us to resolve this application within 30 days, no matter the case. See 28 U.S.C. § 2244(b)(3)(D) ("The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.”).
Nor do we think it is a satisfying answer to refuse to address the requirements laid out in the statute because the petitioner has not met his burden, let alone because he has not even attempted to answer whether Hall was made retroactive by the Supreme Court. Nor should we avoid the issue because the state has not filed a response to Henry's § 2244 application, since the state typically does not respond to these kinds of applications. Nor, finally, would we expect the Florida Supreme Court to have addressed whether the Supreme Court made the rule announced in Hall retroactive to cases on collateral review because the state court is in no way required to engage in the second or successive federal habeas analysis embodied in § 2244.

. The dissent doubts that Hall is even a new rule. These doubts should have ended the inquiry — after all, Henry cannot satisfy the first requirement of § 2244(b)(2)(A) unless he can establish that Hall is a new rule. Moreover, if the rule announced in Hall was already contained within Atkins, then Henry would lose on yet another ground articulated by the statute — Henry would not be able to argue that the Hall rule was “previously unavailable.” 28 U.S.C. § 2244(b)(2)(A). Rather, he would have been required to bring this claim in his original habeas petition, which he filed in 2004, substantially after Atkins had been decided in 2002.

. The dissent gleans from the procedural posture of Hall that the Supreme Court meant for the rule in Hall to apply retroactively. But in Hall, the Supreme Court granted cer-tiorari to review the denial of state collateral relief. And of course the Supreme Court applied the rule in Hall to Hall himself. After all, he asked the Supreme Court to overturn the Florida procedures for determining an intellectual disability when he petitioned the Court to review the denial of state postconviction relief. Importantly, the Supreme Court was not sitting as a court of federal habeas review. And we can divine no intent of the Court to apply the rule in Hall retroactively for future federal habeas petitioners nationwide. Cf. Danforth v. Minnesota, 552 U.S. 264, 275, 280-81, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008) ("Neither Linkletter [v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965)] nor Teague explicitly or implicitly constrained the authority of the States to provide remedies for a broader range of constitutional violations than are re-dressable on federal habeas.”).
Only when the Court has clearly dictated that a rule is retroactive will we so recognize it for purposes of § 2244(b)(2). If the Supreme Court has not held a rule to be retroactive to cases on collateral review, we decline to engage in a complicated retroactivity analysis that Congress and the Court have instructed us to avoid. See Tyler v. Cain, 533 U.S. at 664, 121 S.Ct. 2478 ("The court of appeals must make a decision on the application within 30 days. In this limited time, the court of appeals must determine whether the application ‘makes a prima facie showing that [it] satisfies the [second habeas standard].’ It is unlikely that a court of appeals could make such a determination in the allotted time if it had to do more than simply rely on Supreme Court holdings on retroactivity. The stringent time limit thus suggests that the courts of appeals do not have to engage in the difficult legal analysis that can be required to determine questions of retroactivity in the first instance.” (alterations in original) (citations omitted)). To the extent the dissent explains that Hall should be retroactive, these normative arguments are irrelevant under the statute. See id. at 668, 121 S.Ct. 2478 (O’Con-nor, J., concurring). The Supreme Court must have "made” a new rule retroactive *1160 before Henry may file a second habeas petition. Id.
For the same reason, Teague retroactivity analysis does not tell us whether the Supreme Court has made a new rule retroactive to cases on collateral review for purposes of § 2244(b)(2). See In re Dean, 375 F.3d at 1290 ("It is not enough that a new rule of constitutional law is applied retroactively by this Court or that it satisfies the criteria for retroactive application set forth by the Supreme Court in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).”). As we see it, the dissent has failed to appreciate the procedural posture of the matter before us. Henry has filed an application to file a second or successive petition. That motion is governed by 28 U.S.C. § 2244(b)(2)(A), not Teague.

. The dissent suggests that despite Henry’s IQ score of 78, Henry has made a "prima facie” showing of intellectual disability, even though he admits that he's never been examined by a doctor for purposes of determining his intellectual disability. See Emergency Motion at 13. However, he has not made any allegation, much less pointed to anything in the record, which claims that any mental health expert has said that he is intellectually disabled. Regardless of whether or not he has been examined by an expert for this purpose, we would need at least some allegation to this effect to begin to be persuaded. In any event, this is not the basis for our denial of his application. Indeed, to the extent the dissenting opinion says that we rely on the state’s recent examination to deny Henry’s application, we disagree. Our opinion plainly concludes, first and foremost, that Henry fails to satisfy § 2244(b)(2) because Henry "can point to no IQ test yielding a score of 75 or below,” as required by Hall.